## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BRIAN FLYNN; and GEORGE** | ) | |
| **and KELLY BROWN on behalf** | ) | |
| **of themselves and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:15-cv-855** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FCA US LLC f/k/a** | ) | |
| **CHRYSLER GROUP LLC and** | ) | |
| **HARMON INTERNATIONAL** | ) | |
| **INDUSTRIES, INC.** | ) | |
| **Defendants.** | ) | |

## CLASS ACTION COMPLAINT

NOW COMES Plaintiffs Brian Flynn and George and Kelly Brown, on behalf of themselves and all others similarly situated, and for their Class Action Complaint pursuant to Rule 23 of the Federal Rules of Civil Procedure, allege as follows:

### NATURE OF ACTION

1.       Plaintiffs, and the Class members they propose to represent, purchased or leased defective vehicles manufactured by Defendant FCA US LLC.  The defective vehicles come equipped with an infotainment system called "uConnect." Defendant Harmon International Industries, Inc. is the manufacturer and supplier of the uConnect systems.

2.       These vehicles are defectively designed in that this uConnect system has the access and capability to communicate over vehicle networks that control critical powertrain and safety related functions. uConnect is vulnerable to malicious computer hacks and should thus be segregated from other critical vehicle systems.

3.     Plaintiffs therefore bring this action on behalf of a proposed nationwide class of consumers who purchased or leased FCA US LLC vehicles equipped with the defective uConnect system and also on behalf of statewide classes of consumers who purchased or leased their vehicles in Illinois and Missouri.

**PARTIES**

4.     Plaintiff Brian Flynn is an adult citizen and resident of Belleville, Illinois. On or about June 14, 2013, Flynn purchased a 2014 Jeep Grand Cherokee from Federico Chrysler Dodge Jeep RAM in Wood River, Illinois.

5.     Plaintiffs George and Kelly Brown are married adult citizens and residents of Pacific, Missouri. On or about October 18, 2014, they jointly purchased a 2014 Jeep Cherokee from Dave Sinclair Chrysler Jeep Dodge in Pacific, Missouri.

6.     Defendant FCA US LLC ("FCA US") is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. FCA US is the U.S. subsidiary of Italian multinational automaker Fiat S.p.A. FCA US LLC is formerly known as Chrysler Group LLC. FCA US is in the business of designing, testing, manufacturing, distributing, selling, and supporting the motor vehicles subject of this complaint.  FCA US does business nationwide.

7.     Defendant Harman International Industries, Inc. ("Harman") is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business at 400 Atlantic Street, 15th Floor, Stamford, Connecticut 06901. Harman is in the business of designing, testing, manufacturing, distributing, selling, and supporting the vehicle infotainment system subject of this complaint. Harman does business nationwide.

2

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs. This is a class action in which more than two-thirds of the proposed plaintiff class are citizens of states other than the Defendants.  This Court also has jurisdiction to decide claims brought under 15 U.S.C. § 2301 (the Magnuson-Moss Act) by virtue of 28 U.S.C. § 1332(a)-(d) and 28 U.S.C. § 1331.

9.      This Court has jurisdiction over FCA US because FCA US is registered to conduct business in Illinois and has sufficient minimum contacts in Illinois; or otherwise intentionally avails itself of the markets within Illinois through the promotion, sale, marketing, and distribution of its vehicles to render the exercise of jurisdiction by this Court proper and necessary.

10.      This Court has jurisdiction over Harman because Harman is registered to conduct business in Illinois and has sufficient minimum contacts in Illinois; or otherwise intentionally avails itself of the markets within Illinois through the promotion, sale, marketing, and distribution of their products to render the exercise of jurisdiction by this Court proper and necessary.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

12.      This lawsuit concerns FCA US vehicles equipped with the uConnect 8.4A and uConnect 8.4AN systems manufactured by Harman ("Class Vehicles.") These vehicles include the 2013-2015 RAM 1500, 2500, 3500, 4500, and 5500; 2015 Chrysler 200, 300; 2015 Dodge

3

Charger; 2015 Dodge Challenger; 2014-2015 Jeep Grand Cherokee; 2014-15 Jeep Cherokee; 2014-2015 Dodge Durango; and 2013-2015 Dodge Viper.

13.     The Class Vehicles come equipped with an infotainment system called "uConnect." An infotainment system is computer hardware and software that controls entertainment and navigation systems in a vehicle.  This system is always network connected via 3G cellular data connectivity. It provides internet access to certain applications and can also create a WI-FI hotspot for passengers.  It is also accessible through other vehicle inputs such as the USB port and radio.  Pursuant to 49 CFR 573.5, both Defendants are responsible for the safety of this device.

14.     The Class Vehicles also have other systems that control powertrain and safety functionality. One of these systems is called the CAN bus.  A CAN bus is a vehicle's internal communication network that connects the vehicle's engine control units ("ECUs") with each other.  In computing terms, a "bus" is the system in which components within systems communicate. CAN stands for Controller Area Network. CAN is the type of bus that is standard in the automotive industry.

15.     On July 21, 2015, Wired Magazine published an article in which security researchers demonstrated the ability to remotely hack into a 2014 Jeep Cherokee while it was driving on a highway in St. Louis, MO.[1]  They were able to gain access to the vehicle through security vulnerabilities in the uConnect system. Once they were "inside," the researchers were able to rewrite encoded chips in the uConnect hardware which allowed them to access and issue commands through the vehicle's CAN bus.

---

[1] Andrew Greenberg, *Hackers Remotely Kill a Jeep on the Highway—With Me in It*, Wired Magazine (July 21, 2015) http://www.wired.com/2015/07/hackers-remotely-kill-jeep-highway/

16.     The researchers were able to control the radio, door locks, windshield wipers, display picture on the center console, and other peripheral functions. They then demonstrated their ability to control engine functionality by shutting the vehicle down in highway traffic.  On a closed course, the researchers showed their ability to affect steering and disable braking. If employed by a bad actor, a similar hack could be catastrophic.

17.     The uConnect system is always connected to the internet via 3G cellular data service through the Sprint network. Even if a vehicle owner chooses not to use any internet related services, there is no way to disable this cellular connectivity.

18.     The internet is not the only potential source for an attack. Other security researchers have demonstrated the ability to infiltrate infotainment systems through the radio.[2] Malicious hackers could broadcast harmful signals over radio waves causing a security and safety related crisis as large numbers of vehicles all fail simultaneously.  The uConnect system is also accessible through the vehicles' USB port allowing anyone with access to the vehicle the ability to load malicious software which could then spread to all vehicle systems.

19.     The Class Vehicles are defectively designed in that essential engine and safety functionality is connected to the unsecure uConnect system through the CAN bus.  uConnect should be segregated from these other critical systems. There is no good reason for this current design. The risks associated with coupling these systems far outweigh any conceivable benefit.

20.     A key concept in design security is isolating critical and non-critical systems from one another. Security professionals use a concept called "air gapping" to accomplish this task. Air gapped systems are named as such because there is literally a gap of air between one system and another. Thus, non-critical systems are unable to communicate with critical systems because

---

[2] Chris Vallance, *Car hack uses digital-radio broadcasts to seize control,* BBC NEWS (July 22, 2015) http://www.bbc.com/news/technology-33622298

they are not even physically connected. The Defendants should have employed this concept in the design of these vehicles.

21.     On July 23, 2015, shortly after the Wired article was published, FCA US instituted Safety Recall 15-461 on the request of the NHTSA. This recall, however, only fixed the particular vulnerability that allowed the researchers access to the uConnect.  It did nothing to fix the fundamental design flaw in these vehicles. As long as the uConnect system is physically connected to the vehicles' CAN bus, the potential for vulnerability exists. The overarching defect is a design and system architecture problem in that non-secured systems are coupled with essential engine and safety controls. This is not a software issue.

22.     Software updates are only remedial fixes for vulnerabilities that are already known. Now that the capability to affect powertrain and safety functionality through the uConnect system has been shown, hackers will find new vulnerabilities to exploit and gain access to these critical systems. As technology develops, this problem will only get worse. These vehicles will never be safe or secure.

23.     The recall itself demonstrates that the Defendants have no ability to manage these risks long term.  As part of the recall, Defendants filed documents with the NHTSA outlining the chronology of when they were aware of vulnerabilities and what measures they took to remedy the situation. In these documents, Defendants admit they learned of a security vulnerability with the uConnect systems in January 2014, nearly *eighteen months* before they released the software update. It's clear the Defendant chose to finally update the software only because the flaw was being made public by the security researchers.

24.     This conduct constitutes fraud and is discussed in greater detail elsewhere in this complaint. Besides that, the conduct shows that the Defendants' ability to support this software into the future is inadequate given the design defect's possibility for catastrophic risk.

25.     Any piece of software, whether it's on a computer or an automobile, is capable of having a bug and developing a vulnerability. As the Defendant FCA US said in a post regarding these issues on their company blog "[w]e read about 'hacks' every day. All industries are potential targets of a hacker and the automotive industry has been no exception."[3]  Here, the Defendants acknowledge that they are susceptible to the same risks as other industries.  They should therefore meet the standards these other industries practice.

26.     Supporting existing software with updates as vulnerabilities become known is one of the most crucial tasks the software development community faces. These days, most software is updated remotely through the use of secure connections over the internet. When a software developer discovers a problem, they can issue an update over the air almost immediately. We see this when our phones update downloaded apps and our computers update installed programs. For example, the popular computer PDF program Adobe Acrobat has been updated by its developers seven times since January 2014.[4] The IPhone Facebook App has been updated thirty-seven times in that same time period.[5]

27.     Unlike most software, and because of the design defect, the programs that are loaded onto Class Vehicles can control functions on which life and death rely. Thus, the necessity to support this software with timely updates is even more critical than with programs such as Facebook or Adobe.

---

[3] http://blog.fcanorthamerica.com/2015/07/22/unhacking-the-hacked-jeep/
[4] https://helpx.adobe.com/acrobat/release-note/release-notes-acrobat-reader.html
[5] https://www.appannie.com/apps/ios/app/facebook/

28.     Unfortunately, the Defendants have no effective means of issuing important updates.  For the Defendants to issue a software update, the vehicle owners must either schedule a service visit with their dealer or navigate to a website on their home computers and follow a complicated download and install process. To provide notice of an important update, the Defendants currently have to institute a full NHTSA safety recall. This is not practicable for the future. There will be more vulnerabilities discovered which will necessitate software updates. The Defendants are unable to respond accordingly.

29.     In addition to waiting an unreasonable amount of time to release the software update, the user update process is not secure and the update itself is flawed, further demonstrating that the Defendants have no effective means of securing these vehicles.

30.     To receive the Defendants' recall update, owners can either make a service appointment at a dealership or download the update themselves from the internet. A pre-loaded USB drive is also expected to be mailed to vehicle owners so that they may complete the update without downloading.  It is unknown when that mailing will occur. Many owners will not complete the update at all.

31.     Vehicle owners who decide to update the vehicles themselves were told to go to http://www.driveuConnect.com/software-update/ and follow the on screen instructions. There, owners are forced to download a third-party downloader application which then downloads the software update. This is a confusing and unnecessary step.

32.     Ironically, the update website itself is not secure. It utilizes HTTP instead of HTTPS. This means that a user can not verify the identity of the website. As such, an attacker can put themselves in between an owner's computer and the Defendants' servers. This would allow an attacker to intercept network traffic from a vehicle owner's personal computer and

respond with imitation data. An attacker can create their own, malicious software update and transmit that to a vehicle owner instead of the "correct" copy from the Defendants.  Furthermore, there is no way for a user to verify they received an actual, valid, unaltered copy of the update. This is because the Defendant has not provided for any method by which users can check the update file's integrity and authenticity as is standard practice in software development.

33.     Once a vehicle owner completes the download process, and assuming they receive a correct copy of the update, they then must then install the update into the vehicle's computer systems.  This is accomplished by loading the update onto a USB flash drive and inserting it into the USB port in the car's center armrest.

34.     The downloaded file is a self-extracting compressed ("zipped") executable.  The contents of this zip file is one .ISO disk image. This disk image contains unsecured directories and files in clear text that are readable with any standard word processing software. Among the files is source code for the vehicle's systems. Anyone who downloads this update can examine files in this disk image and gain information that may be used to further exploit vulnerabilities in the vehicle.

35.     The clear text files in this update show that the fix was hastily put together and reveal information that the developers probably did not intend to disclose. As just a few examples, in the update for the 2014 Jeep Cherokee, the following pieces of information are visible in clear text:

a.     In the file "usr\nav_temp\readme_TMCLocFilter_NA.zip.txt" the following text is visible:

> **"The file "TMCLocFilter_NA.zip" is only here so that we can access it during a system install and put it in the NAV area on MMC0(/fs/mmc0/nav/NNG/content/tmc/TMCLocFilter_NA.zip).  This is only needed temporarily and can be safely removed**

**when Joe Matson or Isreal Hall tell us to. - Pete Stephens (1032361)"**

b.      In the file usr\share\scripts\install.sh, amongst the visible source code, are comments that say the following:

**"TODO: waitfor is commented out because of bootloader bug this will open and close channel 4 which was causing problems eventually will remove this and will put the waitfor"**

and

**"File must be less than 2K bytes for security reasons!"**

c.      In numerous files, a username of "**RChen**" appears.

36.     Information that is inadvertently disclosed like this can assist hackers in planning their next attack. Source code and comments in source code shed light on the inner workings of the systems.  Information such as developer names and ID numbers can provide hackers that seek usernames and passwords with potential targets.

37.     The update process and the lack of attention given to the update files show that Defendants are not adequately supporting their vehicles' computer systems with necessary updates. The Defendants are not using reasonable care in the management of their software update process.

38.      Furthermore, this software update demonstrates the dangerous capabilities of the vehicle's USB port. If the Defendants can release an update which supposedly fixes vehicle vulnerabilities using a flash drive, then a malicious hacker could use one to deliver potentially damaging software to the vehicle's computer. The Defendant's July software update does nothing to remedy those potential problems.

39.     The uConnect system's inadequate update capabilities are troubling on their own. Even if the design defect wasn't present and uConnect was not connected to critical systems, it

could still create problems that affect vehicle safety.  For example, a hacker's ability to suddenly increase audio volume in an unsuspecting driver's vehicle could present safety concerns as the driver becomes distracted.  Also, an unsecured uConnect device could potentially broadcast the driver's exact GPS coordinates to bad actors.  However, because the design defect does exist, the seriousness of this is compounded dramatically.

*The Defendant's Fraudulent Conduct*

40.     On July 23, 2015, Defendant FCA US announced NHTSA Safety Recall 15-461. In the Safety Recall Report's Description of the Defect, FCA US states "Some 2013-2015 MY vehicles equipped with RA3 or RA4 model radios have certain software security vulnerabilities which could allow unauthorized third-party access to some networked vehicle control systems."

41.     This is misleading and misstates what the actual defect is.  As discussed *supra*, while there was a software security vulnerability which allowed access into the uConnect system, the real defect is that the uConnect system has the capability to communicate with critical vehicle systems. Defendants' claims that this update makes these vehicles safe are untrue.  By inaccurately describing the problem, the Defendants are perpetrating a fraud on Class Members and giving them a false sense of security.

42.     In other documents associated with the recall, Defendant FCA US disclosed the chronology of when they became aware of vulnerability.  Defendants state they knew the uConnect systems were vulnerable in January 2014 but waited until July 2015, nearly *eighteen months* after learning of the problem, to release a software update. It's clear the Defendants chose to finally update the software only because the flaw was being made public by the security researchers.

43.     The Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 USC § 30101, *et seq*, its accompanying regulations, and state statutory and common law require prompt disclosure of serious safety defects known to a manufacturer. If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect. As such, the Defendants had a duty to notify individuals as soon as they were aware of the problem and work as quickly as possible to offer a solution. They breached that duty by knowingly hiding this information from regulators and class members alike.

44.     Defendants knew or should have known about the existence of both of these defects from when the car was first designed.  They especially should have known about the existence of the defects when they began discovering vulnerabilities in the uConnect software in January 2014. Despite knowledge, the Defendants failed to disclose *anything at all* about the vehicles' security issues until July 2015.  And even now, they refuse to fully acknowledge the extent of the problem.

**DAMAGES**

45.     The safety defects and the Defendants conduct in covering them up have caused damage to Plaintiffs and the Class.

46.     A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

47.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of defects.

48.     Purchasers and lessees of Class Vehicles paid more for the Class Vehicles through a higher purchase price or higher lease payments than they would have had Defendants disclosed the defect. Plaintiffs and those Class members who purchased new or used Class Vehicles overpaid for those Vehicles as the result of the Defendants' conduct. Because Defendants concealed the design defect, these Plaintiffs did not receive the benefit of the bargain. In addition, the value of all Class Vehicles has diminished as the result of Defendants' deceptive conduct.

49.     Plaintiffs and Class members are stuck with vehicles that are now worth less than they would have been but for Defendants' failure to disclose and remedy the defect, and the remaining Class members overpaid at the time of purchase or lease, only to then sell at diminished value after these defect became known.

50.     Plaintiffs and Class members are subjected to a continuing increased risk of severe injury or death but for the Defendants' failure to disclose or remedy the defect.

51.     In addition, Plaintiffs and Class members are subject to a recall that does not cure the actual safety defect. Even if Class Members update their vehicles with the July 23, 2015 safety recall software patch, they are still susceptible to future attacks through the uConnect system and these attacks could still affect critical vehicle systems.

52.     If Defendants had timely disclosed the defects as required by the TREAD Act, the law of fraudulent concealment, and the other State laws set forth below, all Class members' vehicles would now be safe to drive, and would have retained considerably more of their value. Class Vehicles are worth less than vehicles that are perceived to be safe and secure.

53.     Plaintiffs and Class members will suffer continuing harm as news of more vulnerabilities become public and these vehicles are perceived to be defective.

## CLASS ACTION ALLEGATIONS

54.     The Classes' claims all derive directly from a single course of conduct by FCA US and Harman. This case is about the responsibility of FCA US and Harman, at law and in equity, for their knowledge, their conduct, and their products. FCA US and Harman have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class Members. The objective facts on these subjects are the same for all Class Members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating the certification of multi-state classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**I**. **The Nationwide Consumer Class**

55.     Plaintiffs bring this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on their own behalves and on behalf of a Nationwide Consumer Class defined as follows:

> All persons in the United States who purchased or leased vehicles manufactured by FCA US that are equipped with the uConnect 8.4A and uConnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

**II. The State Consumer Classes**

56.     Plaintiffs allege statewide class action claims on behalf of the following classes in the following states ("State Classes"). Each of these State Consumer Classes is initially defined as follows:

> All persons in the State of Illinois who purchased or leased vehicles manufactured by FCA US that are equipped with the uConnect 8.4A and uConnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

> All persons in the State of Missouri who purchased or leased vehicles manufactured by FCA US that are equipped with the uConnect 8.4A and uConnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

57.     The Nationwide Consumer Class, the State Consumer Classes, and their members are sometimes referred to herein as the "Class" or "Classes."

58.     Excluded from the Classes are: FCA US; any affiliate, parent, or subsidiary of FCA US; any entity in which FCA US has a controlling interest; any officer, director, or employee of FCA US; any successor or assign of FCA US; Harman; any affiliate, parent, or subsidiary of Harman; any entity in which Harman has a controlling interest; any officer, director, or employee of Harman; any successor or assign of Harman; counsel for the Plaintiffs or anyone employed by counsel for Plaintiffs in this action and their immediate family; any Judge to whom this case is assigned and his or her immediate family and staff.

59.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

60.     **Numerosity**. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Plaintiffs are informed and believe that there are over a million Class Vehicles nationwide and

thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

61.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

62.     **Existence and predominance of common questions**. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members as is required by Fed. R. Civ. P. 23(a)(2). These common questions include the following:

a.     Whether the coupling of the uConnect system with the vehicle's powertrain and safety systems constitutes a defect in Class Vehicles.

b.     Whether the coupling of the uConnect system with the vehicle's powertrain and safety systems constitutes a safety-related defect in Class Vehicles.

c.     Whether the above alleged defect constitutes a material fact.

d.     Whether the Defendants fraudulently concealed this defects.

e.     Whether the Defendants fraudulently concealed other defects.

e.     Whether the Defendants misrepresented that these vehicles were safe.

f.     Whether the Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose the defects.

16

g.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes.

j.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability.

k       Whether Defendants be declared responsible for notifying all Class members of the defects and ensuring that all Class Vehicles are promptly recalled and remedied.

l.      Whether Defendants are liable under various theories of state liability.

m.      Whether Defendants are liable to the Class for damages and/or penalties, as a result of its own knowledge, conduct, action, or inaction.

n.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to restitution or a preliminary and/or permanent injunction.

63.     **Typicality**. Plaintiffs' claims are typical of the claims of the Class as is required by Fed. R. Civ. P. 23(a)(3), because, among other things, Plaintiffs purchased Class Vehicles which contain the same design defect found in all other Class Vehicles.

64.     **Adequacy**. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.  As such, they meet the requirements of Fed. R. Civ. P. 23(a)(4).

65.    **Declaratory and Injunctive Relief.** Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

66.    **Superiority.** The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against FCA US and Harman economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the design defect, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

67.    In the alternative, the Class may be certified because:

a.    the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for FCA US and Harman;

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the

adjudications, or substantially impair or impede their ability to protect their interests; and

c.      FCA US and Harman have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## CLAIMS FOR RELIEF

**I.      Nationwide Class Claims**

### COUNT I
### Violation of Magnuson-Moss Warranty Act
### (15 U.S.C. Sections 2301, *et seq.*)

68.      Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

69.      Plaintiffs bring this Count on behalf of the Nationwide Class.

70.      This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

71.      The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

72.      Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

73.      Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).  FCA US makes and sells vehicles to consumers, knowing that those vehicles are bought for personal, family, or household purposes.

Harman manufactures items intended to be placed in vehicles that are purchased for personal, family, or household purposes.

74.     Defendants' express warranties are written warranties within the meaning of the

75.     Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

76.     Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

77.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

78.     Defendants breached these warranties as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common design defects in that the infotainment system is not sufficiently isolated from other critical vehicle systems.

79.     In their capacity as a warrantors, Defendants had knowledge of the inherent defects in the Class Vehicles and any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

80.     The limitations on the warranties are procedurally unconscionable. There was

unequal bargaining power between Defendants and Class members, as, at the time of purchase

and lease, Plaintiffs and the other Class members had no other options for purchasing warranty

coverage other than directly from Defendants.

81.     Plaintiffs and each of the other Class members have had sufficient direct dealings

with Defendants or their agents (dealerships) to establish privity of contract. Nonetheless, privity

is not required here because Plaintiffs and each of the other Class members are intended third-

party beneficiaries of contracts between Defendants and their dealers, and specifically, of the

implied warranties. The dealers were not intended to be the ultimate consumers of the Class

Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the

warranty agreements were designed for and intended to benefit consumers. Finally, privity is

also not required because the Class Vehicles are dangerous instrumentalities due to the

aforementioned defects and nonconformities.

82.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action

and are not required to give Defendants notice and an opportunity to cure until such time as the

Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

83.     Furthermore, affording either Defendant an opportunity to cure their breach of

written warranties would be unnecessary and futile here. At the time of sale or lease of each

Class Vehicle, Defendants knew, should have known, or was reckless in not knowing of its

misrepresentations concerning the Class Vehicles' inability to perform as warranted, but

nonetheless failed to rectify the situation and/or disclose the defective design. Under the

circumstances, the remedies available under any informal settlement procedure would be

inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

84.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

85.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

86.     Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Based on the Defendants' continuing failures to fix the known dangerous defects, Plaintiffs seek a declaration that Defendants have not adequately implemented their recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted.

87.     Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the defects in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, purchasing USB drives and the myriad of expenses involved in going through the recall process.

88.     The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT II
### Breach of Implied Warranty of Merchantability
### (MICH. COMP. LAWS § 440.2314)

89.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

90.     This claim is brought on behalf of the Nationwide Class for breach of implied warranty under Michigan law as Defendant FCA US is headquartered there.

91.     Defendant FCA US is a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

92.     Defendant Harman is a merchant with respect to the vehicle infotainment systems within the meaning of MICH. COMP. LAWS § 440.2314(1).

93.     Under MICH. COMP. LAWS § 440.2314, a warranty that the Class Vehicles, including all items in the Class Vehicles, were in merchantable condition was implied by law in the transactions when Class Members purchased their Class Vehicles.

94.     These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.  Without limitation, the Class Vehicles are inherently defective in that the infotainment system is not sufficiently isolated from other critical vehicle systems.

95.     Defendants have been aware of this defect and have failed to provide adequate remedies. Their only attempt at remedy came after the defects were made public.

96.     As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, the Nationwide Class has been damaged in an amount to be proven at trial.

97.     The Nationwide Class also seeks available equitable and/or injunctive relief.

98.     Based on Defendants' continuing failures to fix the known dangerous defects, the Nationwide

99.     Class seeks a declaration that Defendants have not adequately implemented their recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted.

## COUNT III
### Fraud

100.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

101.    This claim is brought on behalf of the Nationwide Class under Michigan law, or, alternatively, under the laws of the all states, as there is no material difference in the law of fraudulent concealment as applied to the claims and questions in this case.

102.    The Defendants each concealed and suppressed material facts concerning the Class Vehicles.

103.     As described above, Defendants each made material omissions and affirmative misrepresentations regarding the defective Class Vehicles.

104.     The Companies each knew these representations were false when made.

105.     The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles are unsecure in that the infotainment system is not sufficiently isolated from other critical vehicle systems.

106.     The Defendants each had a duty to disclose that these vehicles were defective because Plaintiffs and Class Members relied on the Defendants' representations that the vehicles they were purchasing and retaining were safe and free from defects.

107.     The aforementioned concealment was material, because if it had been disclosed Plaintiffs would not have bought, leased or retained their vehicles.

108.     The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. The Defendants each knew or recklessly disregarded that their representations were false and intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

109.     Plaintiffs relied on the Defendants' failure to disclose the defects and the Defendants' affirmative assurances that their vehicles were safe and reliable and other similar false statements-in purchasing, leasing or retaining the Class Vehicles.

110.     Further, Defendants each had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to the Defendants who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff and the Classes. As stated above, these omitted and concealed facts were material

because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

## COUNT IV
### Negligence

111.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

112.    This claim is brought on behalf of the Nationwide Class under the laws of the all states, as there is no material difference in the law of negligence as applied to the claims and questions in this case.

113.    Defendants have designed, manufactured, sold, or otherwise placed in the stream of commerce Class Vehicles that are defective, as set forth above.

114.    Defendants had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs and the other members of the Classes. Defendants breached their duties to Plaintiffs and the other Class Members because they were negligent in the design, development, manufacture, and testing of the Class Vehicles in that the vehicles are designed so that the infotainment system is not sufficiently isolated from other critical vehicle systems.

115.    Defendants were negligent in the design, development, manufacture, and testing of the Class Vehicles because they knew, or in the exercise of reasonable care should have known, that these vehicles equipped with the Uconnect system pose an unreasonable risk of death or serious bodily injury to Class Members in that the Uconnect system is not secure and is coupled with other systems that control essential engine and safety functionality.

116.    Defendants further breached their duties to Class Members in that:

    a.   Defendants knew or had reason to know that the Vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

    b.   Defendants failed to exercise reasonable care to inform customers of the dangerous condition of these vehicles.

117.    Defendants had a continuing duty to warn and instruct the intended and foreseeable users of Class Vehicles of the defective condition of the Class Vehicles and the high degree of risk attendant to using the Vehicles. Class Members are entitled to know that the Class Vehicles, in their ordinary operation, are not reasonably safe for their intended and ordinary purposes and uses.

118.    At all times at which Defendants knew or should have known of the defects described herein, Defendants breached its duty to Plaintiffs and the other Class Members because it failed to warn and instruct Class Members of the defective condition of the Vehicles and the high degree of risk attendant to using the Vehicles.

119.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the other members of the Negligence Classes suffered damages.

**COUNT V**
**Unjust Enrichment**

120.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

121.    This claim for unjust enrichment is brought on behalf of the Nationwide Class under Michigan law, or alternatively, under the laws of all states as there is no material difference in the law of unjust enrichment as it applies to the claims and questions in this case.

27

122.     The Defendants have received and retained a benefit from the Plaintiffs and the Nationwide Class, and inequity has resulted.

123.     Defendants benefitted from avoiding and delaying the effort and expenditures involved in adequately recalling and repairing the Class Vehicles; while Plaintiffs, who originally overpaid for the Class Vehicles, have been forced to pay additional out-of-pocket costs and incur additional expense and losses in connection with the belated recalls.

124.     It is inequitable for Defendants to retain the benefits of their misconduct.

125.     As such, the amount of the Defendants unjust enrichment should be disgorged, in an amount according to proof.

## II.     State Class Claims

### A.     Illinois State Class Claims

**COUNT VI**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS 505/1, et seq. and**
**720 ILCS 295/1A)**

126.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

127.     FCA US and Harman are "persons" as that term is defined in 815 ILCS 505/1(c).

128.     The Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e). The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment,

suppression or omission of such material fact… in the conduct of trade or commerce… whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

129.    Defendants both participated in misleading, false, or deceptive acts that violated the Illinois CFA. By failing to disclose and actively concealing the defects in these vehicles, both Defendants engaged in deceptive business practices prohibited by the Illinois CFA.

130.    In the course of their business, Defendants willfully failed to disclose and actively concealed the defects in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

131.    As alleged above, Defendants knew of defects in vehicle safety while the Illinois Class was deceived into believing the Class Vehicles were safe, and the information could not have reasonably been known by the consumer.

132.    The Companies knew or should have known that their conduct violated the Illinois CFA.

133.    As alleged above, the Companies made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

134.    Defendants engaged in a deceptive trade practice when they failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale.

135.    Defendants deliberately withheld the information about the vehicles' security flaws in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

136.    Although the Defendants were aware of the defects, to protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the defects and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles and allowed all Class Members to continue driving dangerous vehicles.

137.    The Defendants each owed the Illinois Class a duty to disclose the defective nature of Class Vehicles, including the risk of a security breach that could affect essential engine and safety functionality, because they:

a. Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b. Intentionally concealed the hazardous situation with Class Vehicles through their deceptive recall program that they designed to hide the true nature of the problems; and/or

c. Made incomplete representations about the safety and reliability of Class Vehicles, while purposefully withholding material facts from the Illinois Class that contradicted these representations.

138.    The Class Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Illinois Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of loss of control because of these defects.

139.    The Companies' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Illinois Class, about the true safety and reliability of Class Vehicles. The Companies intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Illinois Class.

140.    The ability of the Class Vehicles to suffer an attack which could affect vehicle safety was material to the Illinois Class. Had the Illinois Class known that their vehicles had

these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

141.    All members of the Illinois Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Illinois Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy these serious safety defects, the value of the Class Vehicles has diminished now that related security issues have come to light and the Illinois Class own vehicles that are not safe.

142.    The Illinois Class has been damaged by Defendants' misrepresentations, concealment, and non-disclosure of the defects in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of Defendants' failure to timely disclose and remedy the serious defects.

143.    The Illinois Class Members risk irreparable injury as a result of the Companies' act and omissions in violation of the Illinois CFA, and these violations present a continuing risk to the Illinois Class as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

144.    The recalls and repairs instituted by the Defendants have not been adequate.

145.    As a direct and proximate result of the Companies' violations of the Illinois CFA, the Illinois Class has suffered injury-in-fact and/or actual damage.

146.    Pursuant to 815 ILCS 505/10a(a), the Illinois Class seeks monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

31

147.    The Illinois Class also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS. § 505/1 et. seq.

**COUNT VII**
**Breach of Implied Warranty of Merchantability**
**(810 Illinois Compiled Statutes Section 5/2-314 and**
**810 Illinois Compiled Statutes Section 5/2A-212)**

148.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

149.    In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf the Illinois Class.

150.    Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

151.    Defendants breached the implied warranty that the vehicle was merchantable and safe for use as public transportation by marketing, advertising, distributing and selling vehicles with the common design defects and while misrepresenting the dangers of such vehicles to the public.

152.    These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to the Plaintiffs.

153.    These dangerous defects were the direct and proximate cause of damages to the Plaintiffs.

**COUNT VIII**
**Fraudulent Concealment/Fraud by Omission**

32

154.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

155.    In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf the Illinois Class.

156.    Defendants intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the Class information that is highly relevant to their purchasing decision.

157.    Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, that the Class Vehicles they was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

158.    Defendants knew these representations were false when made.

159.    The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained an unsecured Uconnect system and that unsecured system was coupled with vehicle systems that control engine and safety functionality.

160.    Defendants had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that the defects could cause significant safety issues, because Plaintiffs and the other Class members relied on Defendants' material representations that the Class Vehicles they were purchasing were safe and free from defects.

161.    The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

33

162.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Defendants knew or recklessly disregarded that their representations were false because they knew the vehicles systems were unsecured and susceptible to hacking. Defendants intentionally made the false statements in order to sell Class Vehicles.

163.    Plaintiffs and the other Class members relied on Defendants' failure to disclose the defects and Defendants' affirmative assurances that their Class Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Defendants' Class Vehicles.

164.    As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

165.    Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.

166.    Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**B.    Missouri State Class Claims**

### COUNT IX
### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, et. seq.)

167.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

168.    Plaintiffs bring this claim on behalf of Class members who are Missouri residents (the "Missouri Class").

169.    Defendants and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

170.    Defendants engaged in "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

171.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise…." MO. REV. STAT. § 407.020.

172.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous defects in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles. Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Missouri MPA.

173.    As alleged above, both Defendants knew of the vehicle defects, while the Missouri Class was deceived by the Companies' omission into believing the Class Vehicles were safe, and the information could not have reasonably been known by the consumer.

174.    The Companies knew or should have known that their conduct violated the Missouri MPA.

175.    As alleged above, the Companies made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

176.    Defendants engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. Defendants deliberately withheld the information about the vehicles' security vulnerabilities in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

177.    Although the Defendants were aware of the defects, to protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the defects and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles and allowed all Class Members to continue driving dangerous vehicles.

178.    The Companies each owed the Missouri Class a duty to disclose the defective nature of Class Vehicles, including the security vulnerabilities, because they:

a. Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b. Intentionally concealed the hazardous situation with Class Vehicles through their deceptive recall program that they designed to hide the true nature of the problems; and/or

c. Made incomplete representations about the safety and reliability of Class Vehicles, while purposefully withholding material facts from the Missouri Class that contradicted these representations.

179.    The Class Vehicles posed and/or pose an unreasonable risk of death or serious bodily injury to the Illinois Class, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of loss of control because of these defects.

180.     The Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers about the true safety and reliability of Class Vehicles. The Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Missouri Class.

181.    The ability of the Class Vehicles to suffer an attack which could affect vehicle safety was material to the Missouri Class. Had the Missouri Class known that their vehicles had these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

182.    All members of the Missouri Class suffered ascertainable loss caused by the Companies' failure to disclose material information. The Missouri Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy these serious safety defects, the value of the Class Vehicles has diminished now that related security issues have come to light and the Missouri Class own vehicles that are not safe.

183.    The Missouri Class has been damaged by Defendants' misrepresentations, concealment, and non-disclosure of the defects in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of Defendants' failure to timely disclose and remedy the serious defects.

184.    The Missouri Class Members risk irreparable injury as a result of the Defendants' acts and omissions in violation of the Missouri MPA, and these violations present a continuing

risk to them as well as to the general public. The Companies' unlawful acts and practices complained of herein affect the public interest.

185.    The recalls and repairs instituted by the Defendants have not been adequate.

186.    As a direct and proximate result of the Defendants' violations of the Missouri MPA, the Missouri Class has suffered injury-in-fact and/or actual damage.

187.    Defendants are liable to the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

188.    Pursuant to MO. REV. STAT. § 407.010, Plaintiffs will serve the Missouri Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

189.    Both companies conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles are prone to fail at times and under circumstances that could have resulted in death. Such acts are unfair practices in violation of 15 Mo. Code Reg. 60-8.020.

## COUNT X
### Breach of Implied Warranty of Merchantability
### (MO. REV. STAT. § 400.2-314)

190.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

191.    In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf the Missouri Class.

192.    Defendants are merchants with respect to motor vehicles and component systems of motor vehicles.

193.    Under MO. REV. STAT. § 400.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when the Missouri Class purchased their Class Vehicles.

194.    These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Uconnect infotainment system is unsecured and that unsecured system is coupled with vehicle systems that control essential engine and safety functionality.

195.    Defendants had notice of these issues and chose to not act within a reasonable amount of time after certain vulnerabilities became public.

196.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, the Missouri Class has been damaged in an amount to be proven at trial.

## COUNT XI
## FRAUD BY CONCEALMENT

197.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

198.    In the event the Court declines to certify a nationwide Class under Michigan law, Plaintiffs bring this claim on behalf the Missouri Class.

199.    As described above, Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles.

200.    The Companies knew these representations were false when made.

201.    The vehicles purchased or leased by the Missouri Class were, in fact, defective, unsafe and unreliable, in that the Uconnect infotainment system is unsecured and that unsecured system is coupled with vehicle systems that control essential engine and safety functionality.

202.    The Defendants had a duty to disclose that these vehicles were defective, unsafe and unreliable because the Missouri Class relied on the Companies' representations that the vehicles they were purchasing and retaining were safe and free from defects.

203.    The aforementioned concealment was material because if it had been disclosed the Missouri Class would not have bought, leased or retained their vehicles. When Missouri Class members bought a Class Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would susceptible to hackers infiltrating their systems and further being able to access critical safety and engine functionality.

204.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing, or retaining a new or used motor vehicle. The Defendants knew or recklessly disregarded that their representations were false and intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

205.    Missouri Class members relied on the Companies' failure to disclose the ignition switch system problems and the Companies' affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Defective Vehicles.

206.    As a result of their reliance, the Missouri Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

207.    The Companies' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Missouri Class. Missouri Class members are therefore entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes as defined herein, respectfully request that this Court enter a judgment against FCA US and Harman and in favor of Plaintiffs and the Classes, and grant the following relief:

A.      Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B.      A declaration that these vehicles are defective as described herein.

C.      A declaration that these defects are safety-related.

D.      A declaration that the Defendants be financially responsible for notifying all Class members of the defects present in their vehicles.

E.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely remedy the defects present in the Class Vehicles or refund the purchase price of these vehicles.

F.      An order under which the Court will monitor any recall program or remedial measure for these defects to insure the remedial measures will fully and completely remedy the defects here; and (2) establish by Court decree and administrator, under Court supervision, a program funded by Defendants, under which claims can be made and paid for Class members' recall-related out-of-pocket expenses and costs;

G. Award Plaintiffs and Class members their actual, compensatory and/or statutory damages, according to proof;

H. Award Plaintiffs and the Class Members punitive and exemplary damages in an amount sufficient to punish Defendants for their misconduct and deter the repetition of such conduct Defendants or others;

I. Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

J. Award Plaintiffs and Class Members restitution and/or disgorgement of Defendants' ill-gotten gains for the conduct described in this Complaint

K. Leave to amend this Complaint to conform to the evidence produced at trial; and

L. Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.


Respectfully submitted,


/s/ Michael Gras
Michael Gras, #6303414
Christopher Cueto, #6192248
LAW OFFICE OF CHRISTOPHER CUETO, LTD.
7110 West Main Street
Belleville, IL 62223
Phone:  (618) 277-1554
Fax: (618) 277-0962
mgras@cuetolaw.com

**ATTORNEYS FOR PLAINTIFFS**