## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRIAN FLYNN, GEORGE and KELLY BROWN, and MICHAEL KEITH, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> FCA US LLC f/k/a CHRYSLER GROUP LLC and HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, <br><br> Defendants. | CASE NO. 3:15-CV-855 |

## SECOND AMENDED CLASS ACTION COMPLAINT

NOW COME Plaintiffs Brian Flynn, George and Kelly Brown, and Michael Keith, on behalf of themselves and all others similarly situated, and for their Second Amended Class Action Complaint pursuant to Rule 23 of the Federal Rules of Civil Procedure, allege as follows:

### NATURE OF ACTION

1.     Several of the most popular models of Defendant FCA US LLC's ("FCA") cars and trucks (the "Affected Vehicles") suffer from potentially catastrophic design defects that allow third parties to remotely take control of the vehicles over the Internet while they are being driven.   One vulnerable entry point for the hackers is the Uconnect infotainment system manufactured by Defendant Harman International Industries, Incorporated ("Harman").   Once the hackers gain access to Uconnect, FCA's defective design allows them to further access and take control of the vehicle's critical powertrain and safety related functions, including acceleration, braking, steering, and ignition.

2.      Both Defendants have known about these defects for years.  Researchers brought the vulnerabilities to the auto industry's attention by at least early 2011.  Despite this knowledge, neither Defendant acted to correct these potentially fatal defects or even to notify or warn consumers until July 2015, after essentially being forced to do so when a feature article in WIRED magazine detailed how researchers in a controlled experiment were able to take control of one of FCA's Jeep Cherokees while it was being driven on Interstate 64.

3.      This is the latest in a disturbing recent pattern of evasion and cover-ups by FCA in connection with safety-related issues.  In July 2015, the National Highway Transportation Safety Administration ("NHTSA") levied a fine of $105 million — the largest fine in NHTSA's history — relating to FCA's mishandling of *twenty-three* separate recalls involving *11 million* vehicles.  As NHTSA's administrator bluntly commented, "Fiat Chrysler's pattern of poor performance put millions of its customers, and the driving public, at risk."[1]  And on December 10, 2015, NHTSA fined FCA an additional $70 million for a separate failure to report information about accidents.[2]

4.      Plaintiffs therefore bring this action on behalf of a proposed nationwide class of consumers who purchased or leased FCA vehicles equipped with the defective Uconnect system or, in the alternative, on behalf of statewide classes of consumers who purchased or leased their vehicles in Illinois, Missouri, and Michigan.

---

[1] Bill Vlasic, *Fiat Chrysler Gets Record $105 Million Fine for Safety Issues*, N.Y. TIMES, July 26, 2015, http://www.nytimes.com/2015/07/27/business/fiat-chrysler-faces-record-105-million-fine-for-safety-issues.html.
[2] David Shepardson, *Exclusive: Fiat Chrysler to Pay $70 Million Auto Safety Fine*, REUTERS, Dec. 9, 2015, http://reut.rs/1IVHFbx.

## PARTIES

5.      Plaintiff Brian Flynn is an adult citizen and resident of Belleville, Illinois.  On or about June 14, 2013, Mr. Flynn purchased a 2014 Jeep Grand Cherokee from Federico Chrysler Dodge Jeep RAM in Wood River, Illinois.

6.      Plaintiffs George and Kelly Brown are married adult citizens and residents of Pacific, Missouri.  On or about October 18, 2014, they jointly purchased a 2014 Jeep Cherokee from Dave Sinclair Chrysler Jeep Dodge in Pacific, Missouri.

7.      Plaintiff Michael Keith is an adult citizen and resident of Montague, Michigan. On or about June 10, 2014, Mr. Keith leased a 2014 Ram 1500 from Lakeshore Chrysler in Montague, Michigan; on or about July 24, 2014, Mr. Keith leased a 2014 Jeep Cherokee from Lakeshore Chrysler in Mongtague, Michigan; and on or about July 3, 2015, Mr. Keith leased a 2015 Dodge Challenger from K&M Dodge in Grand Rapids Michigan.

8.      Defendant FCA is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan.   FCA is the U.S. subsidiary of Italian multinational automaker Fiat S.p.A.  FCA is formerly known as Chrysler Group LLC.  FCA is in the business of designing, testing, manufacturing, distributing, selling, and supporting the motor vehicles subject of this complaint.  FCA does business nationwide.

9.      Defendant Harman International Industries, Inc. is a Delaware corporation, with its corporate headquarters and principal place of business at 400 Atlantic Street, 15th Floor, Stamford, Connecticut 06901.  Harman is in the business of designing, testing, manufacturing, distributing, selling, and supporting the Uconnect vehicle infotainment system.  Harman does business nationwide.

3

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs.  Members of the proposed Classes are citizens of States different from Defendants; on information and belief, less than one-third of the proposed members of the plaintiff Classes in the aggregate are citizens of Illinois; and neither Defendant is a citizen of the State of Illinois.  This Court also has jurisdiction to decide claims brought under 15 U.S.C. § 2301 (the Magnuson-Moss Act) by virtue of 28 U.S.C. § 1332(a)-(d) and 28 U.S.C. § 1331, and has supplemental jurisdiction over the remaining claims.

11.     This Court has personal jurisdiction over FCA because FCA is registered to conduct business in Illinois and has sufficient minimum contacts in Illinois, or otherwise intentionally avails itself of the markets within Illinois through the promotion, sale, marketing, and distribution of its vehicles, to render the exercise of jurisdiction by this Court proper.

12.     This Court has jurisdiction over Harman because Harman is registered to conduct business in Illinois and has sufficient minimum contacts in Illinois, or otherwise intentionally avails itself of the markets within Illinois through the promotion, sale, marketing, and distribution of their products, to render the exercise of jurisdiction by this Court proper.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.    The Defects

14.    This lawsuit concerns FCA vehicles equipped with the Uconnect 8.4A and Uconnect 8.4AN systems manufactured by Harman.  These Affected Vehicles include the 2013-2015 RAM 1500, 2500, 3500, 4500, and 5500; 2015 Chrysler 200, 300; 2015 Dodge Charger; 2015 Dodge Challenger; 2014-2015 Jeep Grand Cherokee; 2014-15 Jeep Cherokee; 2014-2015 Dodge Durango; and 2013-2015 Dodge Viper.

15.    Uconnect is one brand of infotainment system.  An infotainment system is the computer hardware and software that controls Bluetooth phone, navigation, and entertainment (e.g., radio, DVD, Internet Wi-Fi, etc.), systems in a car or truck.  The Uconnect system provides Internet access to certain applications and can also create a Wi-Fi hotspot for passengers; the system is therefore always network connected via 3G cellular data connectivity.  It is also accessible through other vehicle inputs such as the radio and a USB port.

16.    On information and belief, FCA and Harman jointly designed the interface between the Uconnect system and the Affected Vehicles.  Pursuant to 49 CFR 573.5 both Defendants are responsible for the safety of the Uconnect system and its integration with the other components and operations of the Affected Vehicles.

17.    The Affected Vehicles have other systems that control powertrain and safety functionality.  One of these systems is called the "CAN" bus ("CAN" being an acronym for Controller Area Network).  In computing terms, a "bus" is the network through which different components communicate with each other.  The CAN bus connects the vehicle's engine control units ("ECUs") with each other.

18.     The Affected Vehicles suffer from three separate types of defects.  First, the Uconnect system manufactured by Harman is exceedingly hackable; that is, it is unreasonably and unsafely vulnerable to unauthorized access by third-parties.  Harman has not implemented adequate safety measures to protect its product against hackers who, after gaining access, could endanger drivers by operating the Uconnect system.  For example, once "inside," a hacker could blare loud music over the stereo or operate the vehicle's Bluetooth telephone, causing dangerous distractions to drivers.  The Amended Complaint refers to this as the "**Hackability Defect**."

19.     Second, FCA's design of the internal architecture of the Affected Vehicles is defective because it fails to prevent hackers from using access gained through attack surfaces (including, but not limited to, the Uconnect system) to remotely take control of the vehicles' acceleration, braking, steering, ignition, and other operational and safety functions.  Indeed, the level and type of connectivity between the Uconnect system and the CAN bus facilitate just this type of attack.  The Amended Complaint refers to this as the "**Remote Control Defect**."

20.     Third, the Uconnect system and Affected Vehicles lack the capability to quickly, automatically, safely, securely, and effectively download software patches that are critical for protecting vehicles from the types of attacks at issue.  Just like cell phones and tablets, the Affected Vehicles are constantly connected to the Internet and are similarly vulnerable to a virus or hack.  Just like cell phones and tablets, the Affected Vehicles should be equipped with the capability to wirelessly and automatically download software security patches "over the air."  Defendants' failure to build such functionality into the Uconnect system and Affected Vehicles ensures that vulnerabilities will persist far longer than they should, if they are remedied at all.  The Amended Complaint refers to this as the "**Inability to Patch Defect**."

21.     Unless otherwise specified, this Amended Complaint refers to the Hackability Defect, Remote Control Defect, and Inability to Patch Defect collectively as the "Defects."

**A.     The Hackability and Remote Control Defects**

*i.     Description of the Defects*

22.     The Hackability and Remote Control Defects are well illustrated by the July 21, 2015, WIRED magazine article titled *Hackers Remotely Kill a Jeep on the Highway – With Me in It*.[3]  A copy of the WIRED article is attached as **Exhibit A**.  The article describes how two researchers — Charlie Miller, a former employee of the National Security Agency ("NSA"), and Chris Valasek, the director of vehicle security research at the consultancy IOActive ("Miller and Valasek") — identified and demonstrated the defects in the Uconnect System and Affected Vehicles.  Specifically, they demonstrated how someone can:

> [Remotely] target [the Affected Vehicles] and [take] wireless control, via the Internet, [of] any of thousands of vehicles.  Their code is an automaker's nightmare: software that lets hackers send commands through the [Affected Vehicle's] entertainment system to its dashboard functions, steering, brakes, and transmission, all from a laptop that may be across the country.

23.     The article's author volunteered to be the subject of an experiment where Miller and Valasek remotely took control of his Jeep Grand Cherokee as he was driving on Interstate 64 near St. Louis, Missouri.

24.     The researchers exploited security vulnerabilities in the vehicle's Uconnect system to gain access.  They then rewrote an encoded chip in the Uconnect hardware, which allowed them to access and issue commands through the vehicle's CAN bus, effectively taking

---

[3] Andrew Greenberg, *Hackers Remotely Kill a Jeep on the Highway—With Me in It*, WIRED, July 21, 2015, http://www.wired.com/2015/07/hackers-remotely-kill-jeep-highway/ (Exhibit A).

control of the vehicle as it was being driven on the interstate.  Once they had accessed the Uconnect system, this update took approximately 25 seconds to implement.[4]

25.    At first, the hackers "toyed with the air conditioning, radio, and windshield wipers."  Then the author describes how, without warning:

> [The researchers] cut the transmission.  Immediately my accelerator stopped working.  As I frantically pressed the pedal and watched the RPMs climb, the Jeep lost half its speed, then slowed to a crawl.  This occurred just as I reached a long overpass, with no shoulder to offer an escape.  The experiment had ceased to be fun. . . . Cars lined up behind my bumper before passing me, honking.  I could see an 18-wheeler approaching in my rearview mirror.  I hoped its driver saw me, too, and could tell I was paralyzed on the highway. . . . The semi loomed in the mirror, bearing down on my immobilized Jeep.

26.    Later, away from the highway, the researchers demonstrated other weapons in their "arsenal," including "fully kill[ing] the engine, abruptly engag[ing] the brakes, or disabl[ing] them altogether."  "The most disturbing maneuver came when they cut the Jeep's brakes, leaving me frantically pumping the pedal as the 2-ton SUV slid uncontrollably into a ditch," according to the author.  On a closed course, the researchers also showed their ability to affect steering.

27.    If employed by a bad actor, a similar hack could affect thousands of vehicles at once, with catastrophic consequences.

28.    Seven days after the WIRED article, United States Senators Edward J. Markey and Richard Blumenthal wrote to the Administrator of NHTSA to raise their concerns regarding this "unprecedented safety threat."  The Senators explained:

> We write concerning the shocking revelations that a software defect in cars may enable hackers to remotely access critical vehicle controls

---

[4] Miller and Valasek published a 90-page study on their hack of the FCA Jeep Grand Cherokee. Charlie Miller & Chris Valasek, *Remote Exploitation of an Unaltered Passenger Vehicle* (Aug. 10, 2015), http://illmatics.com/Remote%20Car%20Hacking.pdf.

through the information and entertainment systems.  Security experts have now demonstrated that it is possible to disable or control vital vehicle systems such as the engine, braking system, steering, and transmission - all from a wireless computer that could be located anywhere.  We were deeply troubled to learn that these software defects can be exploited by malicious hackers to potentially wreak havoc on our roads.  And we were also stunned to learn that despite being aware of this vulnerability for almost 9 months, Fiat Chrysler Automotive (FCA), the manufacturer of the 2014 model Jeep Cherokee featured in *Wired's* article, only recalled the 1.4 million impacted vehicles last week after the publication of the article in question.  These revelations highlight the acute risks now facing modern motorists as automakers continue to connect cars ever closer to the digital world.

29.     The Senators added that "[w]e have serious concerns that regulators and manufacturers have only exposed the tip of this iceberg," and that "[w]e expect that the number of potential attack surfaces in modern vehicles will only increase, and we are only just beginning to understand the nature of the emerging threat posed by car-hacking.  Until we can identify all vulnerable systems and vehicles, car-hacking will continue to present a critical threat to the safety of drivers, passengers, and road users."  A copy of the Senators' letter is attached as **Exhibit B.**

30.     The point of entry exploited by researchers Miller and Valasek (sometimes referred to as the "attack surface") was the Uconnect system, which is always connected to the Internet via 3G cellular data service through the Sprint network.  Even if a vehicle owner chooses not to use any Internet related services, there is no way to disable this cellular connectivity.

31.     The Internet is not the only point of attack.  Other security researchers have demonstrated the ability to infiltrate infotainment systems by broadcasting harmful signals over radio waves causing a security and safety related crisis as large numbers of vehicles all fail simultaneously.  The Uconnect system is also accessible through the vehicles' USB port,

allowing anyone with access to the vehicle the ability to load malicious software that could then spread to all vehicle systems.

32.     The defective design of the Affected Vehicles' Uconnect interface, CAN bus, and other system architecture allows someone who accesses the Uconnect system to send commands to, and take control of, the Affected Vehicles' operational and safety functions.  In their rush to offer additional functionality to consumers, Defendants simply ignored the obvious need to ensure that the Uconnect system and Affected Vehicles' architecture were safe.

33.     At the very least a reasonable manufacturer would have taken certain basic steps to test for and prevent unauthorized access and control.  For example, Defendants should have performed a "penetration test," including a scan to determine whether any ports into the system had been left open.  Had they done so, they would have discovered the open port that Miller and Valasek used for their hack and any other ports that were left open and that may continue to offer access to malicious hackers.  Second, Defendants did nothing to prevent unauthorized messages from being sent through the CAN to control the Affected Vehicles' operational and safety functions.  A simple authentication key — which would verify the source of the incoming commands — could have helped reduce the threat.  Third, from the start (and certainly after the vulnerabilities were demonstrated starting in early 2011), any reasonable manufacturer would have recognized the need for a firewall or intrusion detection application to scan for and detect potentially harmful intrusions to the system, just like the basic anti-virus software installed on virtually every computer.  These are only three of the many steps Defendants should have taken to ensure the safety of the Uconnect system and the Affected Vehicles.

### ii.    *FCA's Recall did not fix the Hackability and Remote Control Defects*

34.    On July 23, 2015, two days after the WIRED article was published, FCA instituted Safety Recall 15V461.   This recall was ineffectual for two independent reasons.   Most importantly, even if the recall could accomplish its objective of patching the vector that the researchers exploited to gain access (which, as alleged below, it did not), it would have addressed only that one, particular vulnerability.   The Uconnect system and the Affected Vehicles contain many attack surfaces and access points that could be exploited by hackers to gain access to the Affected Vehicles' systems.   Preventing access through one has little or no effect on the security of the system as a whole.   The recall's fix is like closing a single window in a house in the middle of a hurricane and hoping that no rain will get in even though other doors and windows remain open.

35.    The recall did nothing to fix the fundamental design flaws of the Uconnect system and the Affected Vehicles.   The Uconnect system still suffers from the Hackability Defect, which allows hackers to access and take control of its functions, and the Affected Vehicles still suffer from the Remote Control Defect, which allows the Uconnect system — and the ready access it provides to hackers — to send commands to essential acceleration, braking, steering, ignition, and other operational and safety functions.

36.    Further, consumers have reported that this purported fix has caused their navigation and radio systems to malfunction, for example by showing an incorrect location of the vehicle on the navigation system and preventing proper control of the radio volume.   Therefore, not only did the recall fail to remedy the vehicle defects, it has further diminished the value of the Affected Vehicles by compromising the functionality of two additional systems.

37.     The Hackability and Remote Control Defects in the underlying architecture of the Affected Vehicles are not capable of being corrected by a software patch like that applied in Defendant FCA's recall.   The Affected Vehicles will never be safe or secure so long as the Uconnect system remains hackable and so long as the Affected Vehicles' system architecture allow unauthenticated and unsafe control signals to be sent to the vehicles' central operational and safety functions.

### B.     The Inability to Patch Defect

38.     Any piece of software, whether on a computer or an automobile, is capable of having a bug, being infected by a virus, or getting hacked.   As Defendant FCA itself candidly admitted in July 2015, "[w]e read about 'hacks' every day.   All industries are potential targets of a hacker and the automotive industry has been no exception."[5]   Despite acknowledging that they are susceptible to the same risks as other industries; FCA and Harman have failed to take even the most basic steps to prevent their vehicles' systems from being hacked.

39.     One such basic preventative step is to support existing software with security updates as vulnerabilities become known.   These days, most software is updated remotely through the use of secure connections over the Internet.   When a software developer discovers a problem, he or she can issue an update over the air almost immediately.   We see this when our phones and computers update apps and other programs.   For example, the popular computer PDF

---

[5] Gualberto Ranieri, *Unhacking the Hacked Jeep® SUV*, FCA NORTH AMERICA (July 22, 2015), http://blog.fcanorthamerica.com/2015/07/22/unhacking-the-hacked-jeep/.

program Adobe Acrobat has been updated by its developers seven times since January 2014,[6] and the IPhone Facebook App has been updated thirty-seven times in that same time period.[7]

40.     Software developers recognize the need to regularly and automatically provide security patches for social networking or office productivity programs like Facebook or Adobe. The software that controls key operational and safety functions of multi-ton vehicles carrying human passengers at high speeds should demand at least similar security updating capability.

41.     Defendants have no safe, secure, and effective means of issuing such important software updates.  To provide notice of an important update, the Defendants currently must institute a full NHTSA safety recall.  Vehicle owners must then either schedule a service visit with their dealer or follow a complicated, unwieldy, unsafe, insecure, and ineffective download and installation process from their home computers.  The complexity, inconvenience, and delay associated with these delivery mechanisms assure that many, if not, most, owners of Affected Vehicles will not install the software patches, and that Affected Vehicles will therefore remain vulnerable to even the specific vulnerability that a given patch is designed to eliminate (as well as other, yet to be identified, vulnerabilities).  As more vulnerabilities are discovered, more software patches will need to be installed, and the cost and inconvenience to owners will multiply.  Defendants' already inadequate recall fix will become increasingly impractical, unsafe, and ineffective.

42.     In addition to the problems associated with the Defendants' method for delivering the software patch, Defendants' software patch process is not secure and the update installed in

---

[6] *Acrobat Help/ Release Notes, Acrobat Reader*, ADOBE ACROBAT, https://helpx.adobe.com/acrobat/release-note/release-notes-acrobat-reader.html (last visited Dec. 20, 2015).
[7] *Facebook*, APP ANNIE, https://www.appannie.com/apps/ios/app/facebook/ (last visited Dec. 20, 2015).

connection with the recall itself is flawed, further demonstrating that the Defendants have failed to provide a safe, secure, and effective process for securing these vehicles.  The update website that Defendant FCA directs owners to use to download the patch is itself not secure.  It utilizes HTTP instead of HTTPS, which means that a user cannot verify the identity of the website.  This means that attackers can put themselves in between an owner's computer and the Defendants' servers, which would allow an attacker to substitute his own malicious software update for the real update from the Defendants.  Furthermore, because the Defendants have not provided for any method by which users can confirm the update file's integrity and authenticity (as is standard practice in software development) there is no way for a user to verify they received an actual, valid, unaltered copy.

43.     Moreover, even if a vehicle owner receives a correct copy of the update, once he or she completes the download process, the vehicle owner then must then install the update into the vehicle's computer systems.  This is accomplished by loading the update onto a USB flash drive and inserting it into the USB port in the car's center armrest.  The downloaded file is a self-extracting compressed ("zipped") executable file.  The content of this zip file is one .ISO disk image.  This disk image contains unsecured directories and files — including sensitive source code — in clear, readable text.  Anyone who downloads the update can examine files in this disk image and gain information that may be used to further exploit vulnerabilities in the Affected Vehicles.

44.     Disturbingly, the text files in the software update for the July 23 recall reveal information that the developers surely did not intend to disclose.  As just a few examples, in the update for the 2014 Jeep Cherokee, the following are visible in clear text:

a.      In the file "usr\nav_temp\readme_TMCLocFilter_NA.zip.txt":

**"The file "TMCLocFilter_NA.zip" is only here so that we can access it during a system install and put it in the NAV area on MMC0(/fs/mmc0/nav/NNG/content/tmc/TMCLocFilter_NA.zip).  This is only needed temporarily and can be safely removed when Joe Matson or Isreal Hall tell us to. - Pete Stephens (1032361)"**

b.      In the file usr\share\scripts\install.sh, in the visible source code:

**"TODO: waitfor is commented out because of bootloader bug this will open and close channel 4 which was causing problems eventually will remove this and will put the waitfor"**

and

**"File must be less than 2K bytes for security reasons!"**

c.      In numerous files, a username of "**RChen**" appears.

45.     Source code and comments in source code like these shed light on the inner workings of the systems and can assist hackers in planning their next attack.  Information such as developer names and ID numbers can provide hackers that seek usernames and passwords with targets for their attacks.  The Defendants are not using reasonable care in the management of their software security update process.

## II.     Defendants Knew of the Defects for More than Four Years but Failed to Warn or Notify Consumers, and Instead Falsely Touted the Safety of Their Products.

46.     Defendants knew of the Defects in their products by early 2011 at the latest.  Despite, or perhaps because of, the potentially fatal consequences that could result, for the next four years Defendants failed to warn, disclose, or notify consumers of the problems, and consistently continued to assure consumers that the Affected Vehicles and Uconnect systems were safe and free from defects.  It took the publication of the WIRED article and the necessity of a public recall for Defendants to finally notify the public, though, as discussed below, even then

the notice evasively failed to communicate the extent and gravity of the threat caused by the

Defects.

47.    In Spring 2011, a team of researchers at the University of Washington and the

University of California, San Diego demonstrated that they could gain remote access to a vehicle

using the car's cellular connection and Bluetooth wireless technology.   Their work received

coverage by major U.S. media sources.  On March 9, 2011, the New York Times reported that,

> In their remote experiment, the researchers were able to undermine the
> security protecting the cellular phone in the vehicle they bought and then
> insert malicious software.  This allowed them to send commands to the
> car's electronic control unit — the nerve center of a vehicle's electronics
> system — which in turn made it possible to override various vehicle
> controls."[8]

48.    Of particular import to the present case, the researchers' 2011 report even

specified that:  "Perhaps the most important part of the long-range wireless attack surface is that

exposed by the remote telematics systems … that provide continuous connectivity via cellular

voice and data network."[9]

49.    The U.S. auto industry had already taken note.   The Society of Automotive

Engineers International had already formed a panel to investigate the issue, and by March 2011

expressed the intention to develop common standards and ways to address hacking.[10]   At the

same time, the United States Council for Automotive Research ("USCAR"), a group funded by

---

[8] John Markoff, *Researchers Show How a Car's Electronics Can Be Taken Over Remotely*, N.Y.
TIMES, Mar. 9, 2011, www.nytimes.com/2011/03/10/business/10hack.html?_r=2.
[9] STEPHEN CHECKOWAY, ET AL., COMPREHENSIVE EXPERIMENTAL ANALYSES OF AUTOMOTIVE
ATTACK SURFACES 5 (n.d.), www.autosec.org/pubs/cars-usenixsec2011.pdf.
[10] Ken Thomas, *Auto industry guards against hacking*, THE ASSOCIATED PRESS, Mar. 9, 2011,
www.washingtonpost.com/wp-dyn/content/article/2011/03/09/AR2011030903980.html.

Detroit's auto companies, was also forming a task force to study the issue.[11]  FCA is a founding member of USCAR.

50.    Despite their knowledge of the Defects and the danger they present, Defendants failed to disclose the Defects and instead touted the safety of their products.  For example,

- In January 2013, FCA issued a press release emphasizing the "**Enhanced security, convenience and occupant safety**" of its Jeep Grand Cherokee, with reference in particular to the features provided by the then-new Uconnect system. (Emphasis added).

- A March 2013 press release from Harman similarly focused on the new features that its Uconnect system provided "**without compromising safety**."  (Emphasis added).

- A July 2013 FCA promotional video titled "2014 Jeep Grand Cherokee Safety" stated that the vehicle had "over 60 safety features" and that "**we've done everything we could to put safety, reliability, and quality in the 2014 Jeep Grand Cherokee.**"  (Emphasis added).

51.    At the very same time (July 2013), *Forbes* published an article describing the work of the researchers behind the WIRED magazine article, Miller and Velasek.[12]  After noting that the researchers' ability to "[g]ain[ ] wireless access to a car's network is old news", the article stated the obvious:

> **The need for scrutiny is growing as cars are increasingly automated and connected to the Internet. . . .** Practically every American carmaker now offers a cellular service or Wi-Fi network like General Motors'

---

[11] *Id.*

[12] Andy Greenberg, *Hackers reveal nasty new car attacks – with me behind the wheel*, FORBES, July 24, 2013, http://www.forbes.com/sites/andygreenberg/2013/07/24/hackers-reveal-nasty-new-car-attacks-with-me-behind-the-wheel-video/.

OnStar, Toyota's Safety Connect and Ford's SYNC.  Mobile-industry trade group the GSMA estimates revenue from wireless devices in cars at $2.5 billion today and projects that number will grow tenfold by 2025. **Without better security it's all potentially vulnerable, and automakers are remaining mum or downplaying the issue.**

(Emphasis added).

52.     The July 2013 *Forbes* article went on to state that

**wireless hacks remain possible and affect the entire industry**: Given that attacks on driving systems have yet to be spotted outside of a lab, manufacturers simply haven't fully secured their software. . . . '**The vulnerabilities that we found were the kind that existed on PCs in the early to mid-1990s, when computers were first getting on the Internet**.'

(Emphasis added).

53.     FCA was also well aware that the United States Senate was looking into the issue. On December 2, 2013 Senator Ed Markey sent letters to 20 major auto manufacturers — including Chrysler Group LLC — asking questions and seeking information about use of remote access technology and safety measures.  The letter specifically asked, "Do any of your vehicles include technology that monitors your vehicles' wireless entry points in order to detect anomalous activity that could indicate that an unauthorized intrusion or inadvertent introduction of malicious code has occurred?"[13]   The letter from Senator Markey also referenced earlier findings by researchers on automotive hacking, including the 2011 research described above in Paragraphs 47-48.  A copy of this letter is attached as **Exhibit C.**

---

[13] Ltr. from Sen. Edward J. Markey to FCA Chief Executive Officer Sergio Marchionne (Dec. 2, 2013).

54.     A February 2015 report released by Senator Markey revealed that FCA ***"did not respond . . . at all"*** to the Senator's December 2013 questions on how FCA assesses automotive security against wireless entry point infiltration.[14]

55.     Despite warnings from Senator Markey, researchers, the media, and others, neither Defendant appears to have taken any of the necessary steps that were so obviously needed to secure their products.

56.     Documents submitted by Defendants FCA to NHTSA in connection with the July 23, 2015 recall show that Defendants certainly knew of the specific vulnerability exploited by the Miller and Valasek by January 2014 at the latest, *eighteen months* prior to the recall.[15]

57.     In March 2014, Harman issued a press release relating to the Uconnect system in the new Jeep Cherokee.  The press release again promotes how Jeep owners can enjoy Uconnect's many features "**all without compromising safety**."

58.     Five months later, on August 6, 2014, Miller and Velasek published a White Paper naming the **2014 Jeep Grand Cherokee the number one "most hackable" car** out of 24 vehicles surveyed.[16]

59.     On July 16, 2015, five days before the WIRED article, FCA announced that it was releasing a "Technical Service Bulletin (TSB) for a software update that offer[ed] customers

---

[14] Sen. Edward J. Markey, *Tracking & Hacking: Security & Privacy Gaps Put American Drivers at Risk*, 5, Feb. 2015, http://www.markey.senate.gov/imo/media/doc/2015-02-06_MarkeyReport-Tracking_Hacking_CarSecurity%202.pdf (emphasis added).

[15] Specifically, the documents state that by January 2014, "through a penetration test conducted by a third party, FCA US LLC ("FCA US") identified a potential security vulnerability pertaining to certain vehicles equipped with RA3 or RA4 radios. . . . A communications port was unintentionally left in an open condition allowing it to listen to and accept commands from unauthenticated sources. Additionally, the radio firewall rules were widely open by default which allowed external devices to communicate with the radio."

[16] Charlie Miller and Chris Velasek, *Survey of Remote Attach Surfaces* (n.d.), *available at* http://blog.hackthecar.com/wp-content/uploads/2014/08/236073361-Survey-of-Remote-Attack-Surfaces.pdf.

improved vehicle electronic security and communications system enhancements." A copy of this announcement is attached as **Exhibit D**. The press release contained no mention of the fact that hackers could remotely take control of the operational and safety functions of the Affected Vehicles or the attendant potentially fatal consequences. Instead, it innocuously and reassuringly described the "software update" as follows:

> Similar to a smartphone or tablet, vehicle software can require updates for improved security protection to reduce the potential risk of unauthorized and unlawful access to vehicle systems. Today's software security update, provided at no cost to customers, also includes Uconnect improvements introduced in the 2015 model year designed to enhance customer convenience and enjoyment of their vehicle. Customers can either download and install this particular update themselves or, if preferred, their dealer can complete this one-time update at no cost to customers.

60. On July 21, 2015, the WIRED magazine article was published.

61. On July 23, 2015, Defendant FCA announced NHTSA Safety Recall 15V461. FCA's description once again materially mischaracterized the nature, extent, and severity of the safety Defects at issue:

> Some 2013-2015 MY vehicles equipped with RA3 or RA4 model radios have certain software security vulnerabilities which could allow unauthorized third-party access to some networked vehicle control systems. Exploitation of the software security vulnerabilities required extensive technical knowledge, physical access to a subject vehicle and a long period of time to write applicable code. A successful exploit of this security vulnerability could result in unauthorized remote modification and control of vehicle systems.
>
> Some 2013-2015 MY vehicles equipped with RA3 or RA4 model radios have certain software security vulnerabilities which could allow unauthorized third-party access to some networked vehicle control systems.

62. An FCA letter notifying consumers of the recall further illustrates FCA's pattern of mischaracterizing the Defects. It states that "[t]he problem is . . . [t]he computer controlled electronic systems on your vehicle may be at risk of unauthorized and/or unlawful access, which

can result in **undesired vehicle behavior(s)**.  Undesired vehicle behavior(s) **could distract the driver** and cause a crash without warning."  (Emphasis added).  It goes on to falsely state that the recall will "**ensure [consumers'] safety**":  *"What you must do to ensure your safety...* Simply contact your Chrysler, Jeep, Dodge or RAM dealer right away to schedule a service appointment."  A copy of this notice is attached as **Exhibit E.**

63.     Contrary to FCA's recall notice, the actual danger is not only that a crash could be caused by driver "distract[ion]," but that a crash could be caused by a remote third party who takes control of the car while it is being driven.  And, contrary to the recall notice's description, the actual Defects at issue were that the Uconnect system was excessively and unsafely vulnerable to being hacked (the Hackability Defect); the Affected Vehicles' system architecture allowed hackers to access and control the vehicles' critical operational and safety functions, including braking, acceleration, steering, and ignition (the Remote Control Defect); and the Affected Vehicles had no way to automatically, safely, securely, and effectively provide security patches as vulnerabilities in the Uconnect system and Affected Vehicles are exposed (the Inability to Patch Defect).   The Defects, individually and collectively, are potentially catastrophic.  Defendants' claims that the recall update made the Affected Vehicles safe are untrue.  By inaccurately describing the problem, the Defendants perpetrated a fraud on Class members.

64.     On July 25, 2015, two days after the recall was announced, FCA's Senior Vice President, Gualberto Ranieri, published a statement on FCA's blog addressing the Jeep hacking, stating, among other things, that **"[w]hen we first learned** of the ability for others to hack into some of our 8.4-inch touchscreen systems, we developed, tested and implemented a software

patch."[17]  This was absolutely false.  By July 2015, FCA had known of the ability for others to remotely hack into their vehicles' systems for more than *four years*.

66.    The Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 USC § 30101, *et seq.*, its accompanying regulations, as well as state statutory and common law, require prompt disclosure of serious safety defects known to a manufacturer.  Defendants had a duty to notify individuals as soon as they were aware of the problems and to work as quickly as possible to offer a solution.  Defendants breached those duties by knowingly hiding information from regulators and Class members alike.

66.    In August 2015, just after the recall, Harman's CEO, Dinesh Paliwal, weighed in. He unambiguously asserted that "**Our system was safe and secure**."[18]

67.    However, Mr. Paliwal went on to explain that "the issue apparently started due to a 'hole' or port opening in a network."  And he noted, both accurately and terrifyingly, that "'**Once you leave the door of the house open, somebody will walk in and they can do whatever they want** … Once people get in the car and get into the CAN bus, then you can start to mimic and mess up many, many things in the car.  It's like having full security in your house and leaving the door open."  (Emphasis added).

68.    Mr. Paliwal also candidly admitted that "**We've been saying that for year-and-half too that [a] connected car means potential cyber threats** and unless we fix that situation, we will have challenges and that's exactly what's being shown in this experiment."  (Emphasis added).  This admission demonstrates both that Harman was well-aware of the Defects and that it

---

[17] Gualberto Ranieri, *Unhacking the Hack: Ensuring Security*, FCA NORTH AMERICA (July 24, 2015), http://blog.fcanorthamerica.com/2015/07/24/unhacking-the-hack-ensuring-security/ (emphasis added).
[18] Abhirup Roy, *Harman says car hacking risk restricted to Fiat Chrysler*, REUTERS, Aug. 4, 2015, http://reut.rs/1K2onkr (emphasis added).

had been sounding a warning for "a year-and-a-half," which directly contradicts Mr. Ranieri's statement that FCA acted "when [FCA] first learned" of the defects in the Uconnect system and the Affected Vehicles.

## DAMAGES

69.     The Defects and Defendants' conduct to misrepresent and conceal them have caused damage to Plaintiffs and the Class in at least four ways, as alleged in detail below.  First, members of the Class would not have purchased the Affected Vehicles at all, or would have paid less for them, had the Defects been disclosed to them.  Second, the Defects have diminished the value of the vehicles; upon resale members of the Class will receive less for their vehicles than they would have had the vehicles been free from the Defects.

70.     Each of these injuries has already occurred.  None of the injuries requires any Class members' vehicle to actually be maliciously hacked.

71.     The injuries are continuing.   As discussed above, the recall instituted by Defendant FCA is ineffective.  Because the recall notice does not communicate the true nature of the Defects or the severity of the danger they present, many owners of Affected Vehicles did not take heed.  Among the subset of owners that did consider participating in the recall, many ultimately chose not to because of the burden associated with bringing the vehicles to the dealership or attempting Defendants' unwieldy and glitchy download and installation procedure. Finally, even for those owners that did participate in the recall, the recall "fix" does not accomplish its objective.  Many users were unable to properly download and install the patch, and even the vehicles for which the patch was properly installed remain susceptible to future attacks because the software patch does nothing to address the underlying Defects, which can still be exploited.

- **Overpayment and Diminution of Value**

72.     A vehicle known to have a serious safety defect is worth less than the equivalent vehicle without the defect.

73.     Purchasers and lessees of the Affected Vehicles paid more than they would have had Defendants disclosed the Defects.  Plaintiffs would not have purchased the Affected Vehicles at all or would not have paid as much for them had they known of the Defects. Plaintiffs and the Class members therefore overpaid for the Affected Vehicles as a result of the Defendants' conduct.  Because Defendants concealed the Defects, Plaintiffs and the Class members did not receive the benefit of their bargain, which was that they were to receive safe vehicles that were free from defects.

74.     In addition, the value of all Affected Vehicles has diminished as the result of the Defects and Defendants' deceptive conduct.  There can be little doubt that demand for the Affected Vehicles and the amount consumers are willing to pay for the Affected Vehicles in the re-sale market has decreased significantly relative to what the demand would have been had the vehicles not been defective.

75.     Anecdotal evidence supports this.  A comment to the first FCA corporate blog entry discussing the hacking vulnerability simply states "I would NEVER buy a product with such a dangerous design."[19]  It is reasonable to believe that this is a common sentiment considering the distressing nature of the Defects and the severity of the consequences of a hack.

76.     Because of the Defects and Defendants' fraudulent conduct touting the Affected Vehicles' safety instead of warning consumers of the dangers that Defendants have known about

---

[19] rberberpa, Comment to Gualberto Ranieri, *Unhacking the Hacked Jeep® SUV*, FCA NORTH AMERICA (July 22, 2015), http://blog.fcanorthamerica.com/2015/07/22/unhacking-the-hacked-jeep/ (capitalization in original).

for more than four years, Plaintiffs and Class members paid more for the Affected Vehicles than they would have and/or are left with vehicles worth less than the defect-free vehicles for which they bargained.

## CLASS ACTION ALLEGATIONS

77.     The Classes' claims all derive directly from a single course of conduct by FCA and Harman.  FCA and Harman have engaged in uniform conduct toward the Class members. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members.  The operative facts on these subjects are the same for all Class members.  The same legal standards govern each Claim for Relief asserted by the respective Classes.  Additionally, the state law claims (fraud, unjust enrichment, breach of implied warranty, and negligence) share the same legal standards and elements of proof across states, thus facilitating the certification of multi-state classes for some or all claims.

78.     Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.     The Nationwide Consumer Class

79.     Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on their own behalves and on behalf of a **Nationwide Class** defined as follows:

> All persons who purchased or leased vehicles in the United States,
> which were manufactured by FCA and which are equipped with

the Uconnect 8.4A or Uconnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

## II.     The State Consumer Classes

80.     In the alternative, in the event that the Court does not certify the Nationwide Class, Plaintiffs allege statewide class action claims on behalf of the following state classes ("State Classes").  Each of these State Classes is initially defined as follows:

> **Illinois State Class:**  All persons who purchased or leased vehicles in the State of Illinois, which were manufactured by FCA and which are equipped with the Uconnect 8.4A or Uconnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

> **Missouri State Class:**  All persons who purchased or leased vehicles in the State of Missouri, which were manufactured by FCA and which are equipped with the Uconnect 8.4A or Uconnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

> **Michigan State Class:**  All persons who purchased or leased vehicles in the State of Michigan, which were manufactured by FCA and which are equipped with the Uconnect 8.4A or Uconnect 8.4AN systems that were subject to the July 23, 2015 NHTSA Safety Recall campaign number 15V461.

81.     The Nationwide Class, the State Classes, and their members are sometimes referred to herein as the "Class" or "Classes."

82.     Excluded from the Classes are:  FCA; any affiliate, parent, or subsidiary of FCA; any entity in which FCA has a controlling interest; any officer, director, or employee of FCA; any successor or assign of FCA; Harman; any affiliate, parent, or subsidiary of Harman; any entity in which Harman has a controlling interest; any officer, director, or employee of Harman; any successor or assign of Harman; counsel for the Plaintiffs or anyone employed by counsel for

Plaintiffs in this action and their immediate families; any Judge to whom this case is assigned and his or her immediate family and staff.

83.    This action has been brought and may properly be maintained on behalf of the Classes proposed above under Federal Rule of Civil Procedure Rule 23.

84.    **Numerosity**. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are over a million Affected Vehicles nationwide and thousands of Affected Vehicles in each of the States.  Individual joinder of all Class members is impracticable.

85.    Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their custody or control. Plaintiffs anticipate providing appropriate notice to each certified Class in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

86.    **Existence of common questions**. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members, as is required by Fed. R. Civ. P. 23(a)(2).  These common questions include:

a.    Whether the nature of the connection of the Uconnect system to the Affected Vehicles' operational and safety systems constitutes a defect in Affected Vehicles.

b.    Whether the nature of the connection of the Uconnect system to the Affected Vehicles' operational and safety systems constitutes a safety-related defect in Affected Vehicles.

c.      Whether the Uconnect system's vulnerability to hacking constitutes a defect in the Uconnect system.

d.      Whether the Uconnect system's vulnerability to hacking constitutes a safety-related defect.

e.      Whether the Affected Vehicles' inability to download in a safe and secure manner automatic, over the air, software security updates constitutes a defect in the Affected Vehicles.

f.      Whether the Affected Vehicles' inability to download in a safe and secure manner automatic, over the air, software security updates constitutes a safety-related defect in the Affected Vehicles.

g.      Whether the Defects constitute material facts that consumers might consider in making their purchasing or leasing decisions.

h.      Whether the Defendants fraudulently concealed these Defects.

i.      Whether the Defendants fraudulently concealed other defects.

j.      Whether the Defendants misrepresented that the Affected Vehicles were safe.

k.      Whether the Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose the Defects.

l.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available.

m.      Whether the Affected Vehicles and Uconnect system were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability.

n.      The scope of any implied warranties applicable to the Affected Vehicles and/or Uconnect system.

o.      Whether Defendants violated the implied warranties applicable to the Affected Vehicles and/or Uconnect system.

p       Whether Defendants be declared responsible for notifying all Class members of the Defects and ensuring that all Affected Vehicles are promptly fixed.

q.      Whether Defendants are liable under various theories of state liability.

r.      Whether Defendants are liable to the Class for damages and/or penalties as a result of their knowledge, conduct, action, or inaction; and

s.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or a preliminary and/or permanent injunction.

87.      **Typicality**.  Plaintiffs' claims are typical of the claims of the Class, Fed. R. Civ. P. 23(a)(3), because, among other things, Plaintiffs purchased Affected Vehicles that contain the same Defects found in all other Affected Vehicles.

88.      **Adequacy**.  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent and are capable and willing to participate in this litigation.   Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.   As such, they meet the requirements of Fed. R. Civ. P. 23(a)(4).

89.     **Declaratory and Injunctive Relief.** Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

90.     **Predominance and Superiority.**  The class action is superior to other available means for the fair and efficient adjudication of this dispute.  The common questions listed in paragraph 86, above, are the central legal and factual issues in the litigation.  The injuries suffered by each Class member, while meaningful on an individual basis, are not of such magnitude as to make the prosecution of individual actions against FCA and Harman economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not.  In addition to the burden and expense of managing many actions arising from the Defects, individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation would increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

91.     In the alternative, the Class may be certified because:

a.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for FCA and Harman; and/or

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications which would, as a practical matter, be dispositive of the

interests of other Class members not parties to the adjudications, or substantially

impair or impede their ability to protect their interests.

## CLAIMS FOR RELIEF

**I.      Nationwide Class Claims**

### COUNT ONE
### Violation of Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301, *et seq.*)

92.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

93.     The Class Plaintiffs bring this Count against Defendants FCA and Harman on

behalf of members of the Nationwide Class.

94.     The Affected Vehicles are "consumer products" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

95.     Plaintiffs and the Class members are the buyers and lessors of the Affected

Vehicles.  They are therefore "consumers" within the meaning of the Magnuson-Moss Warranty

Act.  15 U.S.C. § 2301(3).

96.     FCA and Harman are each a "supplier" and/or "warrantor" within the meaning of

the Magnuson-Moss Warranty Act.  15 U.S.C. § 2301(4)-(5).  Both FCA and Harman are

engaged in the business of making consumer products directly or indirectly available to

consumers, and are obligated under an implied warranty to the Plaintiffs and Class members.

97.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

damaged by the failure of a supplier or warrantor to comply with a written or implied warranty.

98.     Defendants owe the Plaintiffs and other Class members an implied warranty of

merchantability in connection with the purchase or lease of their vehicles and Uconnect systems.

31

As part of the implied warranty of merchantability, FCA and Harman warrant that the Affected Vehicles are fit for their ordinary purpose as passenger vehicles in safe condition and substantially free from defects, and that the Uconnect systems are fit for their ordinary purpose as infotainment systems used in passenger vehicles, and are safe and substantially free from defects.

99.     As described in more detail above Defendants breached those implied warranties, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Affected Vehicles and Uconnect systems share the Hackability Defect, Remote Control Defect, and Inability to Patch Defect.  These design defects make the Affected Vehicles and Uconnect systems unsafe by causing potential distractions to the operator and subjecting control of the vehicle to others through remote access.  In issuing the July 23, 2015 safety recall, FCA has admitted that the Affected Vehicles are defective, but the recall does not fix the design defects.

100.    Any efforts by FCA or Harman to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Affected Vehicles is null and void.

101.    Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between FCA and Harman, on one hand, and Plaintiffs and the other Class members, on the other.

102.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either FCA or its agents to establish privity of contract.

103.    Plaintiffs and each of the Class members are intended third-party beneficiaries of contracts between FCA and Harman, and between FCA and its dealers.

104.    Plaintiffs and the Class members were not required to give notice to Defendants or to afford Defendants an opportunity to cure their breaches of the implied warranties.  FCA and Harman both had actual knowledge, or should have known, or were reckless in not knowing, of the Defects, but Defendants nonetheless failed to correct the Defects prior to the filing of Plaintiffs' Class Action Complaint, thus making formal pre-suit notice unnecessary and futile.  Moreover, Defendants were reasonably notified of Plaintiffs' and the Class members' breach of warranty claims by the filing of the original Class Action Complaint.   Even if notice were deemed to be required, Plaintiffs may proceed prior to affording FCA and Harman a reasonable opportunity to cure their breaches because class plaintiffs would not be obligated to provide notice and opportunity to cure until the Court determines their representative capacity pursuant to Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 2310(e).

105.    Plaintiffs and the Class members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them.  Because FCA and Harman are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Affected Vehicles by retaining them.

106.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

107.    Plaintiffs and the Class members seek all damages permitted by law, in an amount to be proven at trial.

108.    Plaintiffs and the Class members are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  FCA and Harman both had actual knowledge, or should have known, or

were reckless in not knowing, that the recall initiated by FCA and other steps taken by Defendants were inadequate to render the Affected Vehicles safe and merchantable.  Plaintiffs thus request payment of all fees and costs necessary to repair the Defects.  Plaintiffs and other Class members further request re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Defects.

109.    The right of the Plaintiffs and other Class members to recover these expenses as an equitable manner, to put them in the place that they would have been but for FCA and Harman's conduct, presents a common question of law.  Equity and fairness require the establishment by Court decree and administration under Court supervision of a program funded by FCA and Harman, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

110.    Further, based on the Defendants' continuing failures to fix the known dangerous Defects, Plaintiffs and the other Class members seek as equitable relief under 15 U.S.C. § 2310(d)(1):  (a) a declaration that Defendants have not remedied the Defects; and (b) injunctive relief in the form of judicial supervision of a process requiring Defendants to fully repair the Defects or to refund to Class members the purchase prices of their Affected Vehicles.

**COUNT TWO**
**Fraudulent Concealment/Fraudulent Omission**

111.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

112.    Plaintiffs bring this claim on behalf of the Nationwide Class against FCA and Harman under the common law of fraudulent concealment and/or fraudulent omission, as there are no material conflicts among various states' causes of action for fraudulent concealment or fraudulent omission as they apply to this case.

113.    FCA and Harman knew of the Hackability, Remote Control, and Inability to Patch Defects since at least early 2011.

114.    For example, beginning in or about early 2011 and through the present, Defendants concealed, suppressed, and failed to disclose material facts related to the Defects in public statements and communications which were designed and intended by Defendants to reach Plaintiffs and the Class members.  As described in Paragraphs 46 through 68, Defendants made public statements touting the safety and quality of the Affected Vehicles and Uconnect systems, but omitting any mention of the existence of the Defects, or their nature, extent, or severity.  These include, but are not limited to, concealment of material facts in connection with the public notice of the recall of the Affected Vehicles.

115.    At the time that Defendants concealed and suppressed these material facts, Defendants knew of these material facts and/or upon reasonable inquiry, Defendants would have come to know of these material facts.

116.    Defendants made these material omissions with the intention of reaching Plaintiffs and the Class members and influencing Plaintiffs' and the Class members' actions and with the intent that Plaintiffs and Class members rely on Defendants' deception.

117.    These omissions involved facts that were material because: (1) they are facts that would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle; (2) they concern the type of information on which consumers would be expected to rely and would likely consider to be important in making a decision to purchase, lease, or retain a new or used motor vehicle; and (3) they are of the type that a seller knows would be likely to induce a reasonable consumer to act, respond, or substantially change his or her behavior.

118.    These facts are also material because they directly impact the value of the Affected Vehicles that were purchased or leased by Plaintiffs and the Class members.  Whether a manufacturer's products are safe and reliable, whether those products contain defects, and whether that manufacturer stands behind its products are material concerns to a consumer.  In particular, as hacking of computers, networks, and other products have grown increasingly common and dangerous, facts concerning automotive hacking-related defects and vulnerabilities are material to consumers.  Plaintiffs and Class members trusted Defendants not to sell or lease them vehicles that were defective orthat violated federal law governing safety.

119.    Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that their Affected Vehicles and Uconnect systems were capable of performing safely, as represented by Defendants and reasonably expected by consumers.

120.    FCA US and Harman actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and to avoid recalls that would hurt their brands' images and cost Defendants money.  They did so at the expense of Plaintiffs and the Class members.

121.    Plaintiffs and the Class were unaware of these omitted material facts.  Had they been aware of the Defects in the Affected Vehicles and Uconnect systems, and the Defendants' disregard for safety, they would not have purchased, would not have paid as much, or would not have retained their Affected Vehicles for as long a period of time.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

122.    Plaintiffs and the Class members relied on and were deceived by Defendants' material omissions in purchasing, leasing, or retaining their Affected Vehicles.

123.    Defendants had a duty to disclose the Defects because:

a.  Defendants had exclusive and/or far superior knowledge and access to the facts related to the Defects, and these facts were not:  (1) known to Plaintiffs and the Class members; (2) reasonably discoverable by Plaintiffs and the Class members through ordinary or due diligence; and/or (3) within the fair and reasonable reach of Plaintiffs and the Class members;

b.  Plaintiffs and Class members trusted and placed confidence in Defendants to inform them of technical and safety issues related to Uconnect and the Affected Vehicles, including issues related to automotive hacking;

c.  Defendants were in a position of influence and superiority over Plaintiffs and the Class members because Defendants designed and manufactured the Uconnect system and the Affected Vehicles, and Defendants possessed technical expertise and information that Plaintiffs and the Class members lacked; and

d.  Defendants made incomplete representations about the safety and reliability of the Affected Vehicles, while purposefully withholding material facts from Plaintiffs and the Class members that contradicted these representations.

124.  Because of the concealment and/or suppression of the facts, Plaintiffs and the Class members sustained damages.  Accordingly, Defendants are liable to the Class for their damages in an amount to be proven at trial.

125.  Defendants' acts were done wantonly, willfully, maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount

37

sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THREE
### Unjust Enrichment

126.    Plaintiffs and the Class members bring this claim to recover the amounts by which Defendants were unjustly enriched by virtue of their tortious or fraudulent conduct, and in the alternative to the Magnuson-Moss Warranty Act claim.

127.    Plaintiffs bring this claim on behalf of the Nationwide Class against FCA and Harman under the common law of unjust enrichment, as there are no material conflicts among various states' causes of action for unjust enrichment as they apply to this case.   In the alternative, Plaintiffs bring this claim on behalf of the Nationwide Class under Michigan law, because FCA is headquartered there and Michigan has the greatest interest in and most significant relationship to the issues and facts in this dispute.

128.    Plaintiffs and the Class members conferred benefits on FCA and Harman.  FCA and Harman received a benefit through their unjust conduct by selling the Affected Vehicles and Uconnect systems, which share the Hackability Defect, Remote Control Defect, and Inability to Patch Defect.  Plaintiffs and the Class members overpaid for the Affected Vehicles and Uconnect systems, and the Affected Vehicles' values have diminished.

129.    It is inequitable for Defendants to retain these benefits.

130.    Plaintiffs and the Nationwide Class members do not have an adequate remedy at law.

131.    As a result of FCA and Harman's conduct, the amount of their unjust enrichment should be disgorged, in an amount to be proven at trial.

II.     **State Class Claims**

A.      **Illinois State Class Claims**

### COUNT FOUR
### Violation of Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301, *et seq.*)

132.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

133.    In the event the Court does not certify the Nationwide Class, Plaintiffs bring this Count against Defendant FCA on behalf of themselves and the members of the Illinois Class.

134.    The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

135.    Plaintiffs and the Illinois Class members are the buyers and lessors of the Affected Vehicles.  They are therefore "consumers" within the meaning of the Magnuson-Moss Warranty Act.  15 U.S.C. § 2301(3).

136.    FCA is a "supplier" and/or "warrantor" within the meaning of the Magnuson-Moss Warranty Act.  15 U.S.C. § 2301(4)-(5).  FCA are engaged in the business of making consumer products directly or indirectly available to consumers, and is obligated under an implied warranty to the Plaintiffs and Illinois Class members.

137.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a supplier or warrantor to comply with a written or implied warranty.

138.    Defendant FCA owes the Plaintiffs and other Illinois Class members an implied warranty of merchantability in connection with the purchase or lease of their vehicles and Uconnect systems.  As part of the implied warranty of merchantability, FCA warrant that the Affected Vehicles are fit for their ordinary purpose as passenger vehicles in safe condition and

substantially free from defects, and that the Uconnect systems are fit for their ordinary purpose as infotainment systems used in passenger vehicles, and are safe and substantially free from defects.

139.    As described in more detail above Defendant FCA breached those implied warranties, and are therefore liable to Plaintiffs and the members of the Illinois Class pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Affected Vehicles and Uconnect systems share the Hackability Defect, Remote Control Defect, and Inability to Patch Defect.  These design defects make the Affected Vehicles and Uconnect systems unsafe by causing potential distractions to the operator and subjecting control of the vehicle to others through remote access. In issuing the July 23, 2015 recall FCA has admitted that the Affected Vehicles are defective, but the recall does not fix the design defects.

140.    Any efforts by FCA to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Affected Vehicles is null and void.

141.    Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between FCA and Harman, on one hand, and Plaintiffs and the other Illinois Class members, on the other.

142.    Plaintiffs and each of the other Illinois Class members have had sufficient direct dealings with either FCA or its agents to establish privity of contract.

143.    Plaintiffs and other Illinois Class members were not required to give notice to Defendant FCA or to afford Defendant FCA an opportunity to cure its breaches of the implied warranties.  FCA had actual knowledge, or should have known, or was reckless in not knowing, of the Defects, but Defendant FCA nonetheless failed to correct the Defects prior to the filing of

Plaintiffs' Class Action Complaint, thus making formal pre-suit notice unnecessary and futile. Moreover, Defendant FCA was reasonably notified of Plaintiffs' and the Illinois Class members' breach of warranty claims by the filing of the Class Action Complaint.  Even if notice were deemed to be required, Plaintiffs may proceed prior to affording FCA a reasonable opportunity to cure its breaches because class plaintiffs would not be obligated to provide notice and opportunity to cure until the Court determines their representative capacity pursuant to Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 2310(e).

144.    Plaintiffs and the other Illinois Class members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them.  Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Illinois Class members have not re-accepted their Affected Vehicles by retaining them.

145.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

146.    Plaintiffs and the Illinois Class members seek all damages permitted by law, in an amount to be proven at trial.

147.    Plaintiffs and other Illinois Class members are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  FCA had actual knowledge, or should have known, or were reckless in not knowing, that the recall initiated by FCA and other steps taken by Defendants were inadequate to render the Affected Vehicles safe and merchantable.  Plaintiffs thus request payment of all fees and costs necessary to repair the Defects.  Plaintiffs and the other Illinois

Class members further request re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Defects.

148.   The right of the Plaintiffs and other Illinois Class members to recover these expenses as an equitable matter, to put them in the place that they would have been but for FCA and Harman's conduct presents a common question of law.   Equity and fairness require the establishment by Court decree and administration under Court supervision of a program funded by FCA and Harman, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

149.   Further, based on the Defendant FCA's' continuing failures to fix the known dangerous Defects, Plaintiffs and the Illinois Class members seek as equitable relief under 15 U.S.C. § 2310(d)(1):  a declaration that Defendants have not remedied the Defects.

## COUNT FIVE
## Breach of Implied Warranty of Merchantability Under Illinois Law
## (810 ILCS 5/2-314 and 810 ILCS 5/2A-212)

150.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

151.   In the event the Court does not certify the Nationwide Class, Plaintiffs bring this Count against Defendant FCA on behalf of themselves and the members of the Illinois Class.

152.   Defendant FCA is and was at all relevant times a "merchant" with respect to motor vehicles and component systems of motor vehicles, including vehicle infotainment systems.

153.   Defendant FCA impliedly warranted that the Affected Vehicles and Uconnect infotainment systems were in merchantable condition when Plaintiffs and the Illinois Class members leased or purchased their Affected Vehicles.   As part of the implied warranty of

merchantability, FCA warranted that the Affected Vehicles and Uconnect systems were fit for their ordinary purposes as passenger vehicles and infotainment systems for use in passenger vehicles, in safe condition, and substantially free from defects.

154.   The Affected Vehicles and Uconnect systems, when leased or sold, and at all times thereafter, were not merchantable and were unfit for the ordinary purposes for which vehicles and vehicle infotainment systems are used.   All Affected Vehicles and all Uconnect systems suffer from the Hackability Defect, Remote Control Defect, and Inability to Patch Defect.

155.   These design defects make the Affected Vehicles and Uconnect systems unsafe by, without limitation, causing potential distractions to the operator and subjecting control of the vehicle to others through remote access.   FCA has admitted that the Affected Vehicles are defective in issuing its recall, but the recall does not address the design defects.

156.   These dangerous defects existed at the time the vehicles left Defendant FCA's manufacturing facilities and at the time they were sold to the Plaintiffs and the Illinois Class members.

157.   The defective Affected Vehicles and Uconnect systems caused injury and/or damage to Plaintiffs and the Illinois Class members.

158.   Plaintiffs and the Illinois Class members have had sufficient direct dealings with either Defendant FCA or its agents to establish privity of contract.

159.   Plaintiffs and the Illinois Class members were not required to provide direct notice of their allegations of breach of implied warranty to Defendant FCA because Defendant FCA had actual knowledge of the design defects and their breaches of the implied warranties. Moreover, Plaintiffs and the Illinois Class members were not required to give prior notice to

Defendant FCA because Defendant FCA was reasonably notified by the filing of the Class Action Complaint.

160.    As a direct and proximate result of Defendant FCA's breach of the warranties of merchantability, Plaintiffs and other Illinois Class members have been damaged in an amount to be proven at trial.

161.    Plaintiffs and the Illinois Class members also seek available equitable and/or injunctive relief.

162.    Based on the Defendants' continuing failures to fix the known dangerous Defects, Plaintiffs and the Illinois Class members seek:  a declaration that Defendants have not remedied the Defects.

**COUNT SIX**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS 505/1, et seq. and 720 ILCS 295/1A)**

163.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

164.    Plaintiffs bring this claim on behalf of themselves and the members of the Illinois Class.

165.    Plaintiffs and the Illinois Class are consumers who purchased or leased the Affected Vehicles not for resale in the ordinary course of their trade or business, but for their use or for use by a member of their households.

166.    FCA US and Harman are "persons" as that term is defined in 815 ILCS 505/1(c).

167.    In the course of their businesses, trades, and commerce, Defendants knowingly and intentionally took misleading, false, or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").  Defendants misrepresented, willfully

failed to disclose, and actively concealed the dangerous Defects in the Affected Vehicles as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that consumers rely upon such misrepresentations, concealment, suppression, or omission, in connection with the sale of Affected Vehicles and Uconnect systems. Defendants are liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the ICFA.

168.    FCA and Harman knew of the Hackability, Remote Control, and Inability to Patch Defects since at least early 2011.

169.    Defendants concealed and suppressed material facts regarding the Affected Vehicles, and made affirmative misrepresentations regarding the Affected Vehicles. As set out above, the concealed and suppressed material facts include all aspects of the nature of, and threat posed by, Defects, which were well known to Defendants since at least early 2011. The affirmative misrepresentations include, but are not limited to:

a.    FCA's representation that has "done everything [it] could to put safety, reliability, and quality in the 2014 Jeep Grand Cherokee."

b.    FCA's and Harman's representations that FCA vehicles and the Uconnect system added features "without compromising safety."

c.    FCA's misrepresentation that the Defects were that "The computer controlled electronic systems on your vehicle may be at risk of unauthorized and/or unlawful access, which can result in undesired vehicle behavior(s). Undesired vehicle behavior(s) could distract the driver and cause a crash without warning."

45

     d.     FCA's statement that Affected Vehicles' owners' safety would be "ensured" if they participated in the July 23, 2015 recall.

     e.     Harman's statement that "Our system was safe and secure."

170.    Further, for example, beginning in or about early 2011 and through the present, Defendants concealed, suppressed, and failed to disclose material facts related to the Defects in public statements and communications that were designed and intended by Defendants to reach Plaintiffs and the Class members.  As described in Paragraphs 46 through 68, Defendants made public statements touting the safety and quality of the Affected Vehicles and Uconnect systems, but omitting any mention of the existence of the Defects, or their nature, extent, or severity.  These include, but are not limited to, concealment of material facts in connection with the public notice of the recall of the Affected Vehicles.

171.    Defendants made these material omissions and misrepresentations with the intention of reaching Plaintiffs and the Illinois Class members, influencing Plaintiffs' and the Illinois Class members' actions, and with the intent that Plaintiffs and Illinois Class members rely on Defendants' deception.

172.    These affirmative misrepresentations were false at the time that Defendants made them.

173.    At the time that Defendants made these material misrepresentations Defendants knew that their representations were false; and/or Defendants knew that they did not have a reasonable basis for their representations; and/or Defendants acted recklessly without knowledge of their truth.  At the time that Defendants concealed and suppressed these material facts, Defendants knew of these material facts and/or upon reasonable inquiry, Defendants would have come to know of these material facts.

174.     These misrepresentations and omissions involved facts that were material because: (1) they are facts that would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle; (2) they concern the type of information on which consumers would be expected to rely and would likely consider to be important in making a decision to purchase, lease, or retain a new or used motor vehicle; and (3) they are of the type that a seller knows would be likely to induce a reasonable consumer to act, respond, or substantially change his or her behavior.  These facts are also material because they directly impact the value of the Affected Vehicles that were purchased or leased by Plaintiffs and the Illinois Class members.  Whether a manufacturer's products are safe and reliable, whether those products contain defects, and whether that manufacturer stands behind its products are material concerns to a consumer.  In particular, as hacking of computers, networks, and other products have grown increasingly common and dangerous, facts concerning automotive hacking-related defects and vulnerabilities are material to consumers.  Plaintiffs and the Illinois Class members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing safety.

175.     Defendants made these misrepresentations, and concealed and suppressed these material facts, to falsely assure purchasers and consumers that their vehicles and Uconnect system were capable of performing safely, as reasonably expected by consumers.

176.     FCA and Harman actively concealed and/or suppressed and misrepresented these material facts, in whole or in part, to protect their profits and to avoid recalls that would hurt their brands' images and cost Defendants money.  They did so at the expense of Plaintiffs and the Illinois Class members.

177.    Plaintiffs and the Illinois Class members were unaware of these material omissions and unaware of the falsity of Defendants' material misrepresentations.  Plaintiffs and the Illinois Class members were deceived by Defendants' misrepresentations and omissions. Had they been aware of the Defects in the Affected Vehicles and Uconnect systems, and the Defendants' disregard for safety, Plaintiffs and the Illinois Class members would not have purchased, would not have paid as much, or would not have retained their vehicles for as long a period of time.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

178.    Plaintiffs relied on and were deceived by Defendants' representations in purchasing, leasing, or retaining their Affected Vehicles.

179.    Defendants had a duty to disclose the Defects because:

a.      Defendants had exclusive and/or far superior knowledge and access to the facts related to the Defects, and these facts were not:  (1) known to Plaintiffs and the Illinois Class members; (2) reasonably discoverable by Plaintiffs and the Illinois Class members through ordinary or due diligence; and/or (3) within the fair and reasonable reach of Plaintiffs and the Illinois Class members;

b.      Plaintiffs and Illinois Class members trusted and placed confidence in Defendants to inform them of technical and safety issues related to Uconnect and the Affected Vehicles, including issues related to automotive hacking;

c.      Defendants were in a position of influence and superiority over Plaintiffs and the Illinois Class members because Defendants designed and manufactured the Uconnect system and the Affected Vehicles, and Defendants possessed technical

expertise and information that Plaintiffs and the Illinois Class members lacked; and

d.      Defendants made incomplete representations about the safety and reliability of the Affected Vehicles, while purposefully withholding material facts from Plaintiffs and the Illinois Class members that contradicted these representations.

180.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained ascertainable damages including overpaying for the Affected Vehicles and Uconnect systems ordiminution of value of the Affected Vehicles..

181.    Plaintiffs and the Illinois Class members risk irreparable injury as a result of the Defendants' acts and omissions in violation of the ICFA, and these violations present a continuing risk to Plaintiffs and the Illinois Class members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

182.    Plaintiffs have complied with the notice requirement of 815 Ill. COMP. STAT. 505/10a(d) by mailing a copy of the original Class Action Complaint to the Illinois Attorney General.

183.    Accordingly, Defendants are liable to Plaintiffs and the Illinois Class for their damages in an amount to be proven at trial.

184.    Defendants' acts were done wantonly, willfully, maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs' and the Illinois Class's rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT SEVEN
### Fraudulent Concealment/Fraudulent Omission (Under Illinois Law)

185.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

186.   In the event the Court declines to certify a nationwide Class, Plaintiffs bring this claim on behalf of themselves and the Illinois Class.

187.   FCA and Harman knew of the Hackability, Remote Control, and Inability to Patch Defects since at least early 2011.

188.   Defendants concealed and suppressed material facts regarding the nature, extent, and severity of the Defects.

189.   For example, beginning in or about early 2011 and through the present, Defendants concealed, suppressed, and failed to disclose material facts related to the Defects in public statements and communications that were designed and intended by Defendants to reach Plaintiffs and the Class members.  As described in Paragraphs 46 through 68, Defendants made public statements touting the safety and quality of the Affected Vehicles and Uconnect systems, but omitting any mention of the existence of the Defects, or their nature, extent, or severity. These include, but are not limited to, concealment of material facts in connection with the public notice of the recall of the Affected Vehicles.

190.   At the time that Defendants concealed and suppressed these material facts, Defendants knew of these material facts and/or upon reasonable inquiry, Defendants would have come to know of these material facts.

191.   Defendants made these material omissions with the intention of reaching Plaintiffs and the Illinois Class members and influencing Plaintiffs' and the Illinois Class

members' actions and with the intent that Plaintiffs and Illinois Class members rely on Defendants' deception.

192.    These omissions involved facts that were material because: (1) they are facts that would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle; (2) they concern the type of information on which consumers would be expected to rely and would likely consider to be important in making a decision to purchase, lease, or retain a new or used motor vehicle; and (3) they are of the type that a seller knows would be likely to induce a reasonable consumer to act, respond, or substantially change his or her behavior. These facts are also material because they directly impact the value of the Affected Vehicles that were purchased or leased by Plaintiffs and the Illinois Class members. Whether a manufacturer's products are safe and reliable, whether those products contain defects, and whether that manufacturer stands behind its products are material concerns to a consumer. In particular, as hacking of computers, networks, and other products have grown increasingly common and dangerous, facts concerning automotive hacking-related defects and vulnerabilities are material to consumers. Plaintiffs and Illinois Class members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing safety. Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that their Affected Vehicles and Uconnect systems were capable of performing safely, as represented by Defendants and reasonably expected by consumers.

193.    FCA US and Harman actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and to avoid recalls that would hurt their brands' images and cost Defendants money. They did so at the expense of Plaintiffs and the Illinois Class members.

194.    Plaintiffs and the Illinois Class were unaware of these omitted material facts.  Had they been aware of the Defects in the Affected Vehicles and Uconnect systems, and the Defendants' disregard for safety, they would not have purchased, would not have paid as much, or would not have retained their Affected Vehicles for as long a period of time.  Plaintiffs and the Illinois Class members did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

195.    Plaintiffs and the Illinois Class members relied on and were deceived by Defendants' material omissions in purchasing, leasing, or retaining their Affected Vehicles.

196.    Defendants had a duty to disclose the Defects because:

a.      Defendants had exclusive and/or far superior knowledge and access to the facts related to the Defects, and these facts were not:  (1) known to Plaintiffs and the Illinois Class members; (2) reasonably discoverable by Plaintiffs and the Illinois Class members through ordinary or due diligence; and/or (3) within the fair and reasonable reach of Plaintiffs and the Illinois Class members;

b.      Plaintiffs and the Illinois Class members trusted and placed confidence in Defendants to inform them of technical and safety issues related to Uconnect and the Affected Vehicles, including issues related to automotive hacking;

c.      Defendants were in a position of influence and superiority over Plaintiffs and the Illinois Class members because Defendants designed and manufactured the Uconnect system and the Affected Vehicles, and Defendants possessed technical expertise and information that Plaintiffs and the Illinois Class members lacked; and

d.      Defendants made incomplete representations about the safety and reliability of the Affected Vehicles, while purposefully withholding material facts from Plaintiffs and the Illinois Class members that contradicted these representations.

197.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Illinois Class members sustained damages.  Accordingly, Defendants are liable to Plaintiffs and the Illinois Class for their damages in an amount to be proven at trial.

198.    Defendants' acts were done wantonly, willfully, maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs' and the Illinois Class's rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT EIGHT
### Unjust Enrichment (Under Illinois Law)

199.    In the event the Court does not certify the Nationwide Class, Plaintiffs bring this Count against Defendants FCA and Harman on behalf of themselves and members of the Illinois Class.

200.    Plaintiffs and the Illinois Class members bring this claim to recover the amounts by which Defendants were unjustly enriched by virtue of their tortious or fraudulent conduct, and in the alternative to the Magnuson-Moss Warranty Act and breach of implied warranty claims.

201.    Plaintiffs and the Illinois Class members conferred benefits on FCA and Harman. FCA and Harman received a benefit through their unjust conduct by selling the Affected Vehicles and Uconnect systems, which share the Hackability Defect, Remote Control Defect,

and Inability to Patch Defect.  Plaintiffs and the Illinois Class members overpaid for the Affected

Vehicles and Uconnect systems, and the Affected Vehicles' values have diminished.

202.    It is inequitable and violates the fundamental principles of justice, equity, and

good conscience for Defendants to retain these benefits.

203.    Plaintiffs and the Illinois Class members do not have an adequate remedy at law.

204.    As a result of FCA and Harman's conduct, the amount of their unjust enrichment

should be disgorged, in an amount to be proven at trial.

**B.    Missouri State Class Claims**

**COUNT NINE**
**Violation of Missouri Merchandising Practices Act**
**(MO. REV. STAT. § 407.010, et. seq.)**

205.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

206.    Plaintiffs bring this claim on behalf of themselves and members of the Missouri

Class.

207.    Both Defendants and the members of the Missouri Class are "persons" within the

meaning of Mo. Rev. Stat. § 407.010(5).

208.    Defendants engaged in "trade" or "commerce" within the meaning of Mo. Rev.

Stat. § 407.010(7).

209.     Plaintiffs and the members of the Missouri Class purchased the Affected

Vehicles and Uconnect systems for personal, family, or household purposes.

210.     In the course of their businesses, trades, and commerce, Defendants knowingly

and intentionally took misleading, false, or deceptive acts in violation of the Missouri

Merchandising Practices Act ("MMPA").   Defendants misrepresented, willfully failed to

disclose, and actively concealed the dangerous Defects in the Affected Vehicles as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that consumers rely upon such misrepresentations, concealment, suppression, or omission, in connection with the sale of Affected Vehicles and Uconnect systems. Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the MMPA.

211.    FCA and Harman knew of the Hackability, Remote Control, and Inability to Patch Defects since at least early 2011.

212.    Defendants concealed and suppressed material facts regarding the Affected Vehicles, and made affirmative misrepresentations regarding the Affected Vehicles. As set out above, the concealed and suppressed material facts include all aspects of the nature of, and threat posed by, the Defects, which were well known to Defendants since at least early 2011. The affirmative misrepresentations include, but are not limited to:

a.    FCA's representation that it has "done everything [it] could to put safety, reliability, and quality in the 2014 Jeep Grand Cherokee."

b.    FCA's and Harman's representations that FCA vehicles and the Uconnect system added features "without compromising safety."

c.    FCA's misrepresentation that the Defects were that "The computer controlled electronic systems on your vehicle may be at risk of unauthorized and/or unlawful access, which can result in undesired vehicle behavior(s). Undesired vehicle behavior(s) could distract the driver and cause a crash without warning."

d.      FCA's statement that Affected Vehicles' owners' safety would be "ensured" if they participated in the July 23, 2015 recall.

e.      Harman's statement that "Our system was safe and secure."

213.    Further, for example, beginning in or about early 2011 and through the present, Defendants concealed, suppressed, and failed to disclose material facts related to the Defects in public statements and communications that were designed and intended by Defendants to reach Plaintiffs and the Class members.  As described in Paragraphs 46 through 68, Defendants made public statements touting the safety and quality of the Affected Vehicles and Uconnect systems, but omitting any mention of the existence of the Defects, or their nature, extent, or severity. These include, but are not limited to, concealment of material facts in connection with the public notice of the recall of the Affected Vehicles.

214.    Defendants made these material omissions and misrepresentations with the intention of reaching Plaintiffs and the Missouri Class members, influencing Plaintiffs' and the Missouri Class members' actions, and with the intent that Plaintiffs and Missouri Class members rely on Defendants' deception.

215.    These affirmative misrepresentations were false at the time that Defendants made them.

216.    At the time that Defendants made these material misrepresentations Defendants knew that their representations were false; and/or Defendants knew that they did not have a reasonable basis for their representations; and/or Defendants acted recklessly without knowledge of their truth.   At the time that Defendants concealed and suppressed these material facts, Defendants knew of these material facts and/or upon reasonable inquiry, Defendants would have come to know of these material facts.

217.    These misrepresentations and omissions involved facts that were material because: (1) they are facts that would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle; (2) they concern the type of information on which consumers would be expected to rely and would likely consider to be important in making a decision to purchase, lease, or retain a new or used motor vehicle; and (3) they are of the type that a seller knows would be likely to induce a reasonable consumer to act, respond, or substantially change his or her behavior.  These facts are also material because they directly impact the value of the Affected Vehicles that were purchased or leased by Plaintiffs and the Missouri Class members.  Whether a manufacturer's products are safe and reliable, whether those products contain defects, and whether that manufacturer stands behind its products are material concerns to a consumer.  In particular, as hacking of computers, networks, and other products have grown increasingly common and dangerous, facts concerning automotive hacking-related defects and vulnerabilities are material to consumers.  Plaintiffs and the Missouri Class members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing safety.

218.    Defendants made these misrepresentations, and concealed and suppressed these material facts, to falsely assure purchasers and consumers that their vehicles and Uconnect system were capable of performing safely, as reasonably expected by consumers.

219.    FCA and Harman actively concealed and/or suppressed and misrepresented these material facts, in whole or in part, to protect their profits and to avoid recalls that would hurt their brands' images and cost Defendants money.  They did so at the expense of Plaintiffs and the Missouri Class members.

220.     Plaintiffs and the Missouri Class members were unaware of these material omissions and unaware of the falsity of Defendant's material misrepresentations.  Plaintiffs and the Missouri Class members were deceived by Defendants' misrepresentations and omissions. Had they been aware of the Defects in the Affected Vehicles and Uconnect systems and the Defendants' disregard for safety, Plaintiffs and the Missouri Class members would not have purchased, would not have paid as much, or would not have retained their vehicles for as long a period of time.  Plaintiffs and the Missouri Class members did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

221.     Plaintiffs and the Missouri Class members relied on and were deceived by Defendants' representations in purchasing, leasing, or retaining their Affected Vehicles.

222.     Defendants had a duty to disclose the Defects because:

a.     Defendants had exclusive and/or far superior knowledge and access to the facts related to the Defects, and these facts were not:  (1) known to Plaintiffs and the Missouri Class members; (2) reasonably discoverable by Plaintiffs and the Missouri Class members through ordinary or due diligence; and/or (3) within the fair and reasonable reach of Plaintiffs and the Missouri Class members;

b.     Plaintiffs and Missouri Class members trusted and placed confidence in Defendants to inform them of technical and safety issues related to Uconnect and the Affected Vehicles, including issues related to automotive hacking;

c.     Defendants were in a position of influence and superiority over Plaintiffs and the Missouri Class members because Defendants designed and manufactured the Uconnect system and the Affected Vehicles, and Defendants possessed technical

expertise and information that Plaintiffs and the Missouri Class members lacked; and

d.      Defendants made incomplete representations about the safety and reliability of the Affected Vehicles, while purposefully withholding material facts from Plaintiffs and the Missouri Class members that contradicted these representations.

223.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Missouri Class sustained ascertainable damages including overpaying for the Affected Vehicles and Uconnect systems or diminution of value of the Affected Vehicles.

224.    Plaintiffs and the Missouri Class members risk irreparable injury as a result of the Defendants' acts and omissions in violation of the MMPA, and these violations present a continuing risk to Plaintiffs and the members of the Missouri Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

225.    Pursuant to MO. REV. STAT. § 407.010, Plaintiffs will serve the Missouri Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

226.    Both Defendants' conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles are prone to fail at times and under circumstances that could have resulted in death. Such acts are unfair practices in violation of 15 MO. CSR 60-8.020.

227.    Accordingly, Defendants are liable to Plaintiffs and the Missouri Class members for their damages in an amount to be proven at trial.

228.     Defendants' acts were done wantonly, willfully, maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs' and the Missouri Class's rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which

exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT TEN**
**Unjust Enrichment (Under Missouri Law)**

229.    In the event the Court does not certify the Nationwide Class, Plaintiffs bring this Count against Defendants FCA and Harman on behalf of members of themselves and the members of the Missouri Class.

230.    Plaintiffs and the Missouri Class members bring this claim to recover the amounts by which Defendants were unjustly enriched by virtue of their tortious or fraudulent conduct and in the alternative to any contractual claims.

231.    Plaintiffs and the Missouri Class members conferred benefits on FCA and Harman, and it would be inequitable for Defendants to retain those benefits.  FCA and Harman benefitted through their unjust conduct by selling Affected Vehicles and Uconnect systems with design defects.  Plaintiffs and the Missouri Class members overpaid for the Affected Vehicles and Uconnect systems, and Affected Vehicles' values have diminished.

232.    Defendants appreciated the fact that they were conferred a benefit by Plaintiffs and the Missouri Class members.

233.    It is inequitable for Defendants to retain these benefits.

234.    Plaintiffs and the Missouri Class members do not have an adequate remedy at law.

235.    As a result of FCA and Harman's conduct, the amount of their unjust enrichment should be disgorged, in an amount to be proven at trial.

60

C.     **Michigan State Class Claims**

**COUNT ELEVEN**
**Violation of Magnuson-Moss Warranty Act**
**(15 U.S.C. § 2301, *et seq*.)**

236.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

237.    In the event the Court does not certify the Nationwide Class, Plaintiffs bring this Count against Defendants FCA and Harman on behalf of members of the Michigan Class.

238.    The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

239.    Plaintiffs and the Class members are the buyers and lessors of the Affected Vehicles.  They are therefore "consumers" within the meaning of the Magnuson-Moss Warranty Act.  15 U.S.C. § 2301(3).

240.    FCA and Harman are each a "supplier" and/or "warrantor" within the meaning of the Magnuson-Moss Warranty Act.   15 U.S.C. § 2301(4)-(5).   Both FCA and Harman are engaged in the business of making consumer products directly or indirectly available to consumers, and are obligated under an implied warranty to the Plaintiffs and Class members.

241.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a supplier or warrantor to comply with a written or implied warranty.

242.    Defendants owe the Plaintiffs and other Class members an implied warranty of merchantability in connection with the purchase or lease of their vehicles and Uconnect systems. As part of the implied warranty of merchantability, FCA and Harman warrant that the Affected Vehicles are fit for their ordinary purpose as passenger vehicles in safe condition and substantially free from defects, and that the Uconnect systems are fit for their ordinary purpose

61

as infotainment systems used in passenger vehicles, and are safe and substantially free from defects.

243.    As described in more detail above, Defendants breached those implied warranties, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Affected Vehicles and Uconnect systems share the Hackability Defect, Remote Control Defect, and Inability to Patch Defect.  These design defects make the Affected Vehicles and Uconnect systems unsafe by causing potential distractions to the operator and subjecting control of the vehicle to others through remote access.  In issuing the July 23, 2015 recall FCA has admitted that the Affected Vehicles are defective, but the recall does not fix the design defects.

244.    Any efforts by FCA or Harman to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Affected Vehicles is null and void.

245.    Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between FCA and Harman, on one hand, and Plaintiffs and the other Class members, on the other.

246.    Plaintiffs and each of the other Michigan Class members have had sufficient direct dealings with either FCA or its agents to establish privity of contract.

247.    Plaintiffs and each of the Michigan Class members are intended third-party beneficiaries of contracts between FCA and Harman, and between FCA and its dealers.

248.    Plaintiffs and other Michigan Class members were not required to give notice to Defendants or to afford Defendants an opportunity to cure their breaches of the implied warranties.  FCA and Harman both had actual knowledge, or should have known, or were

reckless in not knowing, of the Defects, but Defendants nonetheless failed to correct the Defects prior to the filing of Plaintiffs' Class Action Complaint, thus making formal pre-suit notice unnecessary and futile.  Moreover, Defendants were reasonably notified of Plaintiffs' and the Michigan Class members' breach of warranty claims by the filing of the Class Action Complaint. Even if notice were deemed to be required, Plaintiffs may proceed prior to affording FCA and Harman a reasonable opportunity to cure their breaches because class plaintiffs would not be obligated to provide notice and opportunity to cure until the Court determines their representative capacity pursuant to Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 2310(e).

249.    Plaintiffs and the other Michigan Class members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them.  Because FCA and Harman are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Michigan Class members have not re-accepted their Affected Vehicles by retaining them.

250.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

251.    Plaintiffs and the Michigan Class members seek all damages permitted by law, in an amount to be proven at trial.

252.    Plaintiffs and other Michigan Class members are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  FCA and Harman both had actual knowledge, or should have known, or were reckless in not knowing, that the recall initiated by FCA and other steps taken by Defendants were inadequate to render the Affected Vehicles safe and merchantable.  Plaintiffs

thus request payment of all fees and costs necessary to repair the Defects.  Plaintiffs and other

Michigan Class members further request re-payment of the out-of-pocket expenses and costs

they have incurred in attempting to rectify the Defects.

253.    The right of the Plaintiffs and other Michigan Class members to recover these

expenses as an equitable remedy, to put them in the place that they would have been but for FCA

and Harman's conduct, presents a common question of law.  Equity and fairness require the

establishment by Court decree and administration under Court supervision of a program funded

by FCA and Harman, using transparent, consistent, and reasonable protocols, under which such

claims can be made and paid.

254.    Further, based on the Defendants' continuing failures to fix the known dangerous

Defects, Plaintiffs and the Michigan Class members seek as equitable relief under 15 U.S.C. §

2310(d)(1): (a) a declaration that Defendants have not remedied the Defects; and (b) injunctive

relief in the form of judicial supervision of a process requiring Defendants to fully repair the

Defects or to refund to Class members the purchase prices of their Affected Vehicles.

## COUNT TWELVE
### Violation of Michigan Consumer Protection Act
### (Mich. Compl. Laws § 445.901, *et seq.*)

255.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

256.    Plaintiffs bring this claim on behalf of themselves and the Michigan Class.

257.    Plaintiffs and the members of the Michigan Class purchased the Affected

Vehicles and Uconnect systems for personal, family, or household purposes.

258.    In the course of their businesses, trades, and commerce, Defendants knowingly

and intentionally took misleading, false, or deceptive acts in violation of the Michigan Consumer

64

Protection Act ("MCPA").  Defendants misrepresented, willfully failed to disclose, and actively concealed the dangerous Defects in the Affected Vehicles as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that consumers rely upon such misrepresentations, concealment, suppression, or omission, in connection with the sale of Affected Vehicles and Uconnect systems.  Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the MCPA.

259.    Among other things, in violation of the MCPA, Defendants:

a.    Represented that the Affected Vehicles had characteristics, benefits, or quantities that they do not have;

b.    Represented that the Affected Vehicles were or are of a particular standard, quality, or grade, but the Affected Vehicles were or are of another standard, quality, or grade;

c. Failed to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

d.    Failed to provide to Plaintiffs the promised benefits of the transaction;

e.    Made representations of fact or statements of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

f.    Failed to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

260.    FCA and Harman knew of the Hackability, Remote Control, and Inability to Patch Defects since at least early 2011.

261.    Defendants concealed and suppressed material facts regarding the Affected Vehicles, and made affirmative misrepresentations regarding the Affected Vehicles.  As set out above, the concealed and suppressed material facts include all aspects of the nature of, and threat posed by, the Defects, which were well known to Defendants since at least early 2011.  The affirmative misrepresentations include, but are not limited to:

a.    FCA's representation that has "done everything [it] could to put safety, reliability, and quality in the 2014 Jeep Grand Cherokee."

b.    FCA's and Harman's representations that FCA vehicles and the Uconnect system added features "without compromising safety."

c.    FCA's misrepresentation that the Defects were that "The computer controlled electronic systems on your vehicle may be at risk of unauthorized and/or unlawful access, which can result in undesired vehicle behavior(s).  Undesired vehicle behavior(s) could distract the driver and cause a crash without warning."

d.    FCA's statement that Affected Vehicles' owners' safety would be "ensured" if they participated in the July 23, 2015 recall.

e.    Harman's statement that "Our system was safe and secure."

262.    Further, for example, for example, beginning in or about early 2011 and through the present, Defendants concealed, suppressed, and failed to disclose material facts related to the Defects in public statements and communications that were designed and intended by

Defendants to reach Plaintiffs and the Class members.  As described in Paragraphs 46 through 68, Defendants made public statements touting the safety and quality of the Affected Vehicles and Uconnect systems, but omitting any mention of the existence of the Defects, or their nature, extent, or severity.  These include, but are not limited to, concealment of material facts in connection with the public notice of the recall of the Affected Vehicles.

263.    Defendants made these material omissions and misrepresentations with the intention of reaching Plaintiffs and the Michigan Class members, influencing Plaintiffs' and the Michigan Class members' actions, and with the intent that Plaintiffs and Michigan Class members rely on Defendants' deception.

264.    These affirmative misrepresentations were false at the time that Defendants made them.

265.    At the time that Defendants made these material misrepresentations Defendants knew that their representations were false; and/or Defendants knew that they did not have a reasonable basis for their representations; and/or Defendants acted recklessly without knowledge of their truth.  At the time that Defendants concealed and suppressed these material facts, Defendants knew of these material facts and/or upon reasonable inquiry, Defendants would have come to know of these material facts.

266.    These misrepresentations and omissions involved facts that were material because: (1) they are facts that would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle; (2) they concern the type of information on which consumers would be expected to rely and would likely consider to be important in making a decision to purchase, lease, or retain a new or used motor vehicle; and (3) they are of the type that a seller knows would be likely to induce a reasonable consumer to act, respond, or

substantially change his or her behavior.  These facts are also material because they directly impact the value of the Affected Vehicles that were purchased or leased by Plaintiffs and the Michigan Class members.  Whether a manufacturer's products are safe and reliable, whether those products contain defects, and whether that manufacturer stands behind its products are material concerns to a consumer.  In particular, as hacking of computers, networks, and other products have grown increasingly common and dangerous, facts concerning automotive hacking-related defects and vulnerabilities are material to consumers.  Plaintiffs and Michigan Class members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing safety,.

267.    Defendants made these misrepresentations, and concealed and suppressed these material facts, to falsely assure purchasers and consumers that their vehicles and Uconnect system were capable of performing safely, as reasonably expected by consumers.

268.    FCA and Harman actively concealed and/or suppressed and misrepresented these material facts, in whole or in part, to protect their profits and to avoid recalls that would hurt their brands' images and cost Defendants money.  They did so at the expense of Plaintiffs and the Michigan Class members.

269.    Plaintiffs and the Class were unaware of these material omissions and unaware of the falsity of Defendant's material misrepresentations.  Plaintiffs and the Michigan Class members were deceived by Defendants' misrepresentations and omissions.  Had they been aware of the Defects in the Affected Vehicles and Uconnect systems and the Defendants' disregard for safety, Plaintiffs and the Michigan Class members would not have purchased, would not have paid as much, or would not have retained their vehicles for as long a period of time.  Plaintiffs

and the Michigan Class members did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

270.    Plaintiffs and the Michigan Class members relied on and were deceived by Defendants' representations in purchasing, leasing, or retaining their Affected Vehicles.

271.    Defendants had a duty to disclose the Defects because:

a.      Defendants had exclusive and/or far superior knowledge and access to the facts related to the Defects, and these facts were not:  (1) known to Plaintiffs and the and the Michigan Class members; (2) reasonably discoverable by Plaintiffs and the Michigan Class members through ordinary or due diligence; and/or (3) within the fair and reasonable reach of Plaintiffs and the Michigan Class members;

b.      Plaintiffs and Michigan Class members trusted and placed confidence in Defendants to inform them of technical and safety issues related to Uconnect and the Affected Vehicles, including issues related to automotive hacking;

c.      Defendants were in a position of influence and superiority over Plaintiffs and the Michigan Class members because Defendants designed and manufactured the Uconnect system and the Affected Vehicles, and Defendants possessed technical expertise and information that Plaintiffs and the Michigan Class members lacked; and

d.      Defendants made incomplete representations about the safety and reliability of the Affected Vehicles, while purposefully withholding material facts from Plaintiffs and the Michigan Class members that contradicted these representations.

272.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Michigan Class members sustained ascertainable damages including overpaying for the Affected Vehicles and Uconnect systems or diminution of value of the Affected Vehicles.

273.    Plaintiffs and the members of the Michigan Class risk irreparable injury as a result of the Defendants' acts and omissions in violation of the MCPA, and these violations present a continuing risk to Plaintiffs and the members of the Michigan Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

274.    Both Defendants' conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles are prone to fail at times and under circumstances that could have resulted in death.

275.    Accordingly, Defendants are liable to Plaintiffs and the Michigan Class for their damages in an amount to be proven at trial.

276.    Defendants' acts were done wantonly, willfully, maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs' and the Michigan Class's rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT THIRTEEN**
**Unjust Enrichment (Under Michigan Law)**

277.    In the event the Court does not certify the Nationwide Class, Plaintiffs bring this Count against Defendants FCA and Harman on behalf of themselves and the members of the Michigan Class.

278.    Plaintiffs and the Michigan Class members bring this claim to recover the amounts by which Defendants were unjustly enriched by virtue of their tortious or fraudulent conduct, and in the alternative to the Magnuson-Moss Warranty Act claim.

279.    Plaintiffs and the Michigan Class members conferred benefits on FCA.  FCA and Harman received a benefit through their unjust conduct by selling Affected Vehicles and Uconnect systems, which share the Hackability Defect, Remote Control Defect, and Inability to Patch Defect.  Plaintiffs and the Michigan Class members overpaid for the Affected Vehicles and Uconnect systems, and the Affected Vehicles' values have diminished.

280.    Plaintiffs and the Michigan Class members would suffer inequity if Defendants retain these benefits.

281.    Plaintiffs and the Michigan Class members do not have an adequate remedy at law.

282.    As a result of FCA and Harman's conduct, the amount of their unjust enrichment should be disgorged, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes as defined herein, respectfully request that this Court enter a judgment against Defendants FCA and Harman and in favor of Plaintiffs and the Classes, and grant the following relief:

A.      Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B.      A declaration that the Affected Vehicles and Uconnect system are defective as described herein.

C.      A declaration that these defects are safety-related.

D.      A declaration that the Defendants be financially responsible for notifying all Class members of the Defects present in the Affected Vehicles and Uconnect system.

E.      An order requiring Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Affected Vehicles and Uconnect system.

F.      Award Plaintiffs and Class members their actual, compensatory, and/or statutory damages, according to proof;

G.      Award Plaintiffs and the Class members punitive and exemplary damages in an amount sufficient to punish Defendants for their misconduct and deter the repetition of such conduct by Defendants or others;

H.      Award Plaintiffs and Class members restitution and/or disgorgement of Defendants' ill-gotten gains for the conduct described in this Complaint;

I.      Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and expenses;

J.      Award Plaintiffs and Class members pre-judgment and post-judgment interest;

K.      Leave to amend this Amended Complaint to conform to the evidence produced at

trial; and

L.      Award Plaintiffs and Class members such other relief as the case may require; or

as determined to be just, equitable, and proper by this Court.


Dated: September 21, 2017                   Respectfully submitted,


                                            /s/ *Stephen R. Wigginton*
                                            Stephen R. Wigginton #6200459
                                            Christopher D. Baucom #06284672
                                            Lucas Pendry #06309893
                                            ARMSTRONG TEASDALE LLP
                                            7700 Forsyth  Blvd.
                                            St. Louis, MO 63105
                                            T: (314) 621-5070
                                            F: (314) 621-5065
                                            swigginton@armstrongteasdale.com
                                            cbaucom@armstrongteasdale.com
                                            lpendry@armstrongteasdale.com

                                            IJay Palansky  (*pro hac vice*)
                                            Emily Buckley (*pro hac vice*)
                                            ARMSTRONG TEASDALE LLP
                                            4643 S. Ulster, Suite 800
                                            Denver, CO 80237
                                            T: (720) 200-0676
                                            F: (720) 200-0679
                                            ipalansky@armstrongteasdale.com
                                            ebuckely@armstrongteasdale.com

                                            Michael Gras, #6303414
                                            Christopher Cueto, #6192248
                                            LAW OFFICE OF CHRISTOPHER CUETO, LTD.
                                            7110 West Main Street
                                            Belleville, IL 62223
                                            Phone:  (618) 277-1554
                                            Fax: (618) 277-0962
                                            mgras@cuetolaw.com

                                            ***Attorneys for Plaintiffs***

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned attorney, hereby certify that on September 21, 2017, I filed a copy of the foregoing using the Court's CM/ECF electronic filing system, which will send notification of the same to all counsel of record.


*/s/ Stephen R. Wigginton*